The BALIAN ICE CREAM CO., Inc., a Corporation, Appellant,

v.

ARDEN FARMS CO., a Corporation, et al., Appellees.

Nos. 13578-13592.

United States Court of Appeals Ninth Circuit.

Oct. 31, 1955.

Rehearing Denied Dec. 27, 1955.

Writ of Certiorari Denied March 26, 1956.

See 76 S.Ct. 545.

Shephard, Mullin, Richter & Balthis, Gordon F. Hampton, Richard B. Hoegh, Los Angeles, Cal., for appellant.

Gibson, Dunn & Crutcher, Henry F. Prince, Julian O. von Kalinowski, Cosgrove, Cramer, Diether & Rindge, Leonard A. Diether, Jesse R. O'Malley, Los Angeles, Cal., for appellee.

Before STEPHENS and FEE, Circuit Judges, and LING, District Judge.

JAMES ALGER FEE, Circuit Judge.

Plaintiffs brought fifteen separate actions against defendants under § 4 of the Clayton Act, 15 U.S.C.A. § 15, claiming violations of the federal anti-trust laws. The basic claim was that each plaintiff who is an independent ice cream manufacturer or distributor in the Los Angeles area sustained injury when Arden Farms Co., which operates in the manufacture and distribution of dairy products in the same area, lowered its prices upon ice cream in this area alone. Prices

on all of its ice cream products were reduced with the exception of prices upon "diced" ice cream manufactured by Arden exclusively and just being introduced on the market. The gist of the complaint was that Arden operated in the northwest states and in Arizona and that discrimination was proved because the price level upon like products in these states was not made to conform to the Los Angeles price level.

Findings of fact of the trial court were extensive.[1] Based thereon, the court held that the statute had not been violat-

---

1. "Findings of Fact

"* * *

"3. In these Findings of Fact and in the Conclusions of Law which follow, unless otherwise noted herein, the terms hereinafter listed shall have the definition and meaning set opposite each:

"Los Angeles Area—All of Los Angeles County and some portions of San Bernardino, Riverside, Ventura, Santa Barbara and Orange Counties, all of said counties being located in the State of California.

"Ice Cream Products—One or more of the following: Ice cream, sherbet, ice milk, ice cream mix and ice milk mix in all forms and grades, and various frozen novelties containing one or more of the following: Ice cream, ice milk, or water ice.

"Milk Products—Milk and certain related products.

"Ice Cream Distributing Subsidiaries—Defendants Frigid Process Company Inc., and Ritz Ice Cream Corp. (subsidiaries of Arden Farms Co., a Delaware corporation) who manufactured, sold or distributed ice cream products at wholesale in the Los Angeles area.

"Diced Cream—A packaged individual serving of ice cream, sherbet, or ice milk of standardized quality which has been packaged by a certain patented machine.

"Jobber or Distributor—A person, firm or corporation in the business of buying ice cream products from manufacturers at wholesale in large quantities and selling same to retailers in smaller quantities.

"4. Plaintiff, The Balian Ice Cream Co., Inc., is a California corporation with its principal place of business in Los Angeles County, California. Said plaintiff is a manufacturer of ice cream products and sells such products at wholesale to route-delivered customers in a portion of the Los Angeles area.

"5. (a) There are two defendants herein having the name Arden Farms Co. One of said defendants is a Delaware corporation (sometimes hereinafter referred to as 'Arden') with its principal place of business in Los Angeles County, California. Arden is engaged among other things in the business of manufacturing ice cream products and selling same at wholesale to route-delivered and jobber customers in the States of California, Washington, Oregon, Idaho and Montana. Arden has four ice cream products manufacturing plants in California; they are located at Los Angeles, San Diego, Fresno and Oakland. Arden has one ice cream products manufacturing plant in Oregon and two in Washington. Arden is also engaged in the business of producing and purchasing milk and from a portion thereof manufactures certain related products. Arden is also engaged in the business of selling milk products at wholesale and at retail in the States of California and Washington.

"(b) The other defendant herein having the name of Arden Farms Co. is an Arizona corporation (sometimes hereinafter referred to as 'Arden of Arizona') with its principal place of business in Phoenix, Arizona. Said defendant is a wholly owned subsidiary of Arden and is engaged in the business of manufacturing ice cream products and selling same at wholesale to route-delivered and jobber customers in the State of Arizona. Said defendant has an ice cream products manufacturing plant in Phoenix, Arizona.

* * *

"(c) Defendant Equipment Enterprises, Inc., is a California corporation with its principal place of business in Los Angeles County, California. Said defendant is a wholly owned subsidiary of Arden and does not manufacture, distribute or sell ice cream products, milk products or any other related products.

"(d) Defendant Market Wholesale Grocery Co. is a California corporation with its principal place of business in Los Angeles County, California. Said defendant is engaged in the business of selling groceries and related products at wholesale in the Los Angeles area but it does not manufacture, distribute or sell ice cream products, milk products or any other related products. * * *

"(e) Prior to January 1, 1951, defendant Frigid Process Company, Inc., was a California corporation (sometimes hereinafter referred to as 'Frigid') with its principal place of business in Los Angeles County, California. Said defendant at all times referred to in the complaint herein

ed and that no actionable discrimination had been practiced. Judgment for defendants followed. 104 F.Supp. 796. Plaintiffs took these appeals, which are now consolidated.

prior to January 1, 1951, was a wholly owned subsidiary of Arden and had an ice cream products manufacturing plant in Oakland and South Pasadena. Frigid was engaged primarily in the business of manufacturing frozen novelties and selling same at wholesale to other ice cream products manufacturers and to jobbers in Oakland and in the Los Angeles area. On January 1, 1951, the assets of said defendant were sold to third parties. Since said latter date Arden has not owned any stock of said defendant nor has it had any interest in or control of said defendant.

"(f) Prior to January 1, 1950, Ritz Ice Cream Corp. was a California corporation doing business as the Holly-Maid Ice Cream Co. (sometimes hereinafter referred to as 'Holly-Maid') with its principal place of business in Los Angeles County, California. Said defendant at all times referred to in the complaint herein prior to January 1, 1950, was a wholly owned subsidiary of Arden. * * * On or about January 1, 1950, said defendant merged with Arden and on or about said date Ritz Ice Cream Corp. ceased to exist as a separate entity.

"(g) Defendant Diced Cream of America Co. is a Delaware corporation (sometimes hereinafter referred to as 'Diced') with its principal place of business located in Los Angeles County, California. Said defendant is engaged primarily in the business of leasing machines upon which it owns patents for packaging an individual serving of ice cream, sherbet or ice milk of a standardized quality under the trade name of 'Diced Cream,' and in the business of selling cartons for use in said machines. The consideration for all of the common stock of said defendant was paid for by Arden and the stock was issued to voting trustees pursuant to a Voting Trust Agreement. The corresponding voting certificates were issued to Arden and on September 1, 1949, Arden distributed to its stockholders all of said voting trust certificates. * * *

"6. For several years prior to November 21, 1949, and particularly during that portion of the year 1949 up to November 21, 1949, the business of selling ice cream products in the State of California and particularly in the Los Angeles area had been very competitive. During said period Arden and its ice

The contentions are: (1) By establishing a blanket price cut on ice cream in the Los Angeles area, defendants had discriminated in price upon a territorial basis by maintaining at the same time

cream distributing subsidiaries sold their respective ice cream products at wholesale in virtually every city and local community throughout the Los Angeles area, but many of their competitors sold their ice cream products at wholesale in only a portion of the Los Angeles area and some in only one or two cities or local communities in said Los Angeles area. The plaintiff sold its ice cream products only in a portion of the Los Angeles area. Every ice cream products manufacturer and jobber in the Los Angeles area, large and small, including the plaintiff, is and was a competitor of Arden and of its ice cream distributing subsidiaries. The business of Arden and of its ice cream distributing subsidiaries in selling ice cream products at wholesale were and are substantially and adversely affected by competitive conditions in every such city or local community. * * *

"7. For a number of years prior to the trial of this action, practically all the ice cream products manufacturers including Arden and its ice cream distributing subsidiaries selling at wholesale in the State of California published price lists of their respective ice cream products although there was no legal requirement for such publication. For several years prior to November 21, 1949, said published price lists did not represent the actual selling prices at wholesale of a substantial quantity of ice cream products sold in said area. During said period competitors of Arden and its ice cream distributing subsidiaries in the Los Angeles area made numerous changes and deviations from their respective published price lists resulting in lower selling prices for ice cream products thus enabling said competitors to gain a larger share of the ice cream products trade in said area. During said period said competitors were offering and gave inducements to prospective customers at wholesale, such as gratuities, rebates and discounts, free services, free material and equipment, free use of material and equipment, and the like, as a means of selling their respective ice cream products. During said period said competitors in the Los Angeles area and other areas in the State of California offered to sell and sold ice cream products at wholesale at prices as low or lower than the prices (after any and all rebates and discounts) established by

higher prices for the same products in other areas, such as the northwest. (2) It is claimed that the District Court required plaintiffs to prove that Arden was motivated by a purpose or intent to harm a competitor, whereas it is contended the statute does not require such proof. (3) It is claimed that the District Court required plaintiffs to disprove the existence of an alleged affirmative defense that Arden was meeting in good faith the equally low price of a competitor when it made the differential in prices in the Los Angeles area, whereas the statute placed the

Arden on November 21, 1949, hereinafter referred to, for ice cream products of like grade, quality and quantity in said areas. For some time prior to November 21, 1949, competition in the business of selling ice cream products at wholesale in said areas was so intense that that the price structure for said products was very badly broken down. Said competitive activities of said competitors substantially and adversely affected the ice cream products business of Arden and of its ice cream distributing subsidiaries in said areas.

"8. For several years prior to November 21, 1949, and particularly during that portion of the year 1949 up to November 21, 1949, Arden and its ice cream distributing subsidiaries, in order to retain their customers and to gain new ones, in many instances met or attempted to meet the lower competitive prices of their competitors in the State of California and particularly in the Los Angeles area in the sale of their respective ice cream products. During said period Arden and its ice cream distributing subsidiaries in said areas made numerous changes and deviations from their respective published price lists to meet or in attempting to meet said lower competitive prices of their competitors in said areas. The average net selling price for all ice cream products sold by Arden gradually declined during the year 1949. * * *

"9. In 1946 and 1947 there came into being a product known as Foster Freeze, an ice milk product which spread rapidly through the establishment of stores where soft ice milk was sold. Similar stores had existed before but the Foster product gave impetus to their growth. In 1948 and that portion of the year 1949 prior to November 21, 1949, stores and business establishments in the State of California and particularly in the Los Angeles area selling soft ice milk were in competition with stores and business establishments selling ice cream products and the former were successful in securing a substantial portion of the ice cream products trade in said areas. The ice cream products business of Arden and of its ice cream distributing subsidiaries was substantially and adversely affected by the

competition from the sale of said soft ice milk.

"10. During the period here involved a number of ice cream products manufacturing plants in the Los Angeles area and other areas in the State of California (sometimes hereinafter referred to as 'captive creameries') were owned by large grocery chains or other chain retail outlets, and such plants manufactured ice cream products solely for such owners. The number of such plants increased during the years 1948 and 1949. The retail outlets supplied by captive creameries in said areas sold certain of said ice cream products so manufactured by captive creameries during the year 1948 and that portion of the year 1949 prior to November 21, 1949, at prices lower than the wholesale prices for ice cream products of like grade, quality or quantity being charged by other ice cream products manufacturers in said areas including Arden and its ice cream distributing subsidiaries. The quantity of ice cream products sold by the retail outlets supplied by captive creameries in said areas was substantial. Other markets, chains and independent stores in said areas, having no interest in captive creameries, in order to meet said prices of the retail outlets supplied by captive creameries demanded lower prices at wholesale from their respective ice cream products manufacturers. Customers of Arden and its ice cream distributing subsidiaries were in competition with retail outlets supplied by captive creameries and said customers made demand on Arden and its ice cream distributing subsidiaries for lower prices at wholesale for ice cream products in order to sell at competitive prices. * * *

"11. The total quantity of ice cream products sold by Arden and its ice cream distributing subsidiaries in the State of California and in the Los Angeles area for the years 1946 to and including the year 1950 are as follows:

| | Los Angeles Area | State of California |
|---|---|---|
| 1946 .. | 7,191,396 gals. | 11,057,662 gals. |
| 1947 .. | 6,471,274 gals. | 9,166,377 gals. |
| 1948 .. | 5,029,405 gals. | 7,783,031 gals. |
| 1949 .. | 4,376,617 gals. | 6,876,637 gals. |
| 1950 .. | 4,200,673 gals. | 6,803,312 gals. |

"The decline in gallonage was substan-

burden of pleading and proof upon the defendants. (4) Further, it was claimed under the facts of the instant case that even this affirmative defense was not available to Arden under the statute for these reasons. Arden, it is said, (a) did not meet "individual competitive situations," but blanketed a local area with a market-wide price cut, (b) took such action offensive in nature rather than of a limited defensive character, and (c) did not show that any competitor's price it claimed to meet was a lawful price or that its lowered price was for a product

tially due to competitive conditions herein found to exist in the Los Angeles area and other areas of the State of California, and to other competitive conditions shown by the evidence in this action.

"12. The percentage of ice cream products in gallons sold by Arden and its ice cream distributing subsidiaries in the Los Angeles area to the total ice cream products in gallons manufactured by all ice cream products manufacturers in the Los Angeles area for the years 1946 to and including 1950 are as follows:

| 1946 | 23% |
|------|-----|
| 1947 | 22% |
| 1948 | 20% |
| 1949 | 18% |
| 1950 | 17% |

"The decrease in sales was substantially due to competitive conditions herein found to exist in the Los Angeles area and to other competitive conditions shown by the evidence in this action.

"13. * * * The percentage of ice cream products in gallons sold by plaintiff and the plaintiffs in said fourteen actions in the Los Angeles area to the total quantity of ice cream products in gallons manufactured in the Los Angeles area during said years was as follows:

| 1946 | 11% |
|------|-----|
| 1947 | 11% |
| 1948 | 13% |
| 1949 | 13% |
| 1950 | 13% |

"14. During the year 1948 and that portion of the year 1949 prior to November 21, 1949, Arden made continuous efforts to meet the competitive conditions herein found and other competitive conditions shown by the evidence in this action, by bringing out new items in its line of ice cream products, increasing its advertising and merchandising campaigns and instilling more life into its sales organization. Said efforts were not successful in stopping Arden's continuous decline in the total sales of ice cream products in the State of California nor in the Los Angeles area * * *.

"15. The main items of cost in the manufacture of ice cream products are butterfat, serum solids and labor, the latter customarily being measured in man hours. For some time prior to November 21, 1949, the cost of said items to Arden, in general, gradually declined and continued to decline until May, 1950. During 1949 and 1950 the cost of butterfat was at its lowest point in May, 1950.

"16. From the latter part of December, 1948, until November 21, 1949, the officers and directors of Arden were very critically concerned with said competitive conditions. The published price lists at wholesale of its cream products manufacturers in the State of California and in the Los Angeles area were unrealistic. On November 14, 1949, it was the conclusion of said officers and directors, after long and mature consideration, that there was only one way to remedy the situation created by the competitive conditions herein found to exist and other competitive conditions shown by the evidence in this action and that was for Arden to establish lower prices at wholesale for its ice cream products in order to compete with said competitive conditions. On or about November 19, 1949, Arden published a new price list reducing the prices at wholesale for its respective ice cream products except frozen novelties and Diced Cream. The prices of said latter products remained the same. Said published price list became effective on November 21, 1949, and will sometimes hereinafter be referred to as the "price reduction of Arden." The prices (after any and all rebates and discounts) established by Arden in the Los Angeles area and in other areas of the State of California on said date were not lower than the prices at wholesale of its competitors on or before November 19, 1949, for ice cream products of like grade, quality and quantity in the Los Angeles area and other areas in the State of California. The prices established by the price reduction of Arden were in effect until October 18, 1950, when said prices were increased by reason of Arden's increased costs.

"17. Said officers and directors, concurrently with said price reduction, in order to bring all items of expense to a minimum, initiated and put into effect a series of changes in Arden's methods of manufacturing, distributing and selling

of the same grade and quality as that of a competitor or for sales of the same quantity.

Arden is one of the largest dairy products firms in the west. It owns in Los Angeles an ice cream plant which is one of the largest in the United States. It does some interstate shipping out of its Portland, Oregon, office into the State of Washington and out of its Spokane, Washington, division to Idaho and Montana. It sells at Seattle, Washington, and at Los Angeles, California, ice cream to interstate carriers. The Arizona subsidiary obtains from Arden at Los Angeles ice cream products for sale in Arizona and for use on an interstate carrier. The San Diego plant distributes ice

its ice cream products, resulting in the elimination of all unnecessary expenses, the reduction of personnel, the reduction of advertising expenses, the reorganization of Arden's sales department and manufacturing department, and the simplification of Arden's line of ice cream products. Said changes resulted in a substantial decrease in the total cost to Arden of the ice cream products manufactured, distributed and sold by it.

"18. The prices established by the price reduction of Arden and the sale by it of ice cream products at such prices were made in good faith to meet the lawful and equally low prices of its competitors in the sale of ice cream products of like grade, quality and quantity, and were made by reason of competitive conditions herein found and other competitive conditions shown by the evidence in this action. The action of the officers and directors of Arden in establishing said price reduction and the prices so established by Arden for its ice cream products was justified by business and economic considerations of the type which reasonable men take into consideration in making such a decision when confronted with said competitive conditions and other factors affecting Arden's business, such as, diminishing sales. The action of Arden in establishing said prices and selling its ice cream products at such prices was reasonable.

"19. Frigid reduced the prices at wholesale of its frozen novelties on October 24, 1949. It did not thereafter prior to the trial of this action reduce the prices of its frozen novelties. In the latter part of November, 1949, Frigid reduced the price at wholesale of its bulk and packaged ice cream to its route-delivered customers. Said price reduction will sometimes hereinafter be referred to as the 'price reduction of Frigid.' The quantity of bulk and packaged ice cream sold by Frigid to its route-delivered customers was small as compared to its total business. The prices established by the price reduction of Frigid and the sale by it of ice cream products at such prices on or about that time in the ice cream products industry in the Los Angeles area, and by reason of the competitive conditions herein found and other competitive conditions shown by the evidence in this action. The prices (after any and all rebates and discounts) established by the price reduction of Frigid in the Los Angeles area were not lower than the prices at wholesale of its competitors prior to and at the time of said reduction for ice cream products of like grade, quality and quantity in the Los Angeles area. At no time here in question did any defendant other than Frigid set or attempt to set the prices at which Frigid sold its ice cream products.

"20. The prices established by the price reduction of Frigid and the sale by it of ice cream products at such prices were made in good faith to meet the lawful and equally low prices of its competitors in the sale of ice cream products of like grade, quality and quantity and were made by reason of competitive conditions herein found and other competitive conditions shown by the evidence in this action. * * *

"21. Holly-Maid reduced the price at wholesale of its ice cream products on November 30, 1949, except frozen novelties and Diced Cream. The price of said latter products remained the same. Said price reduction will hereinafter sometimes be referred to as the 'price reduction of Holly-Maid.' The prices established by the price reduction of Holly-Maid and the sale by it of ice cream products at such prices were made to meet the prevailing prices on or about that time in the ice cream products industry in the Los Angeles area and by reason of the competitive conditions herein found and other competitive conditions shown by the evidence in this action. * * *

"22. The prices established by the price reduction of Holly-Maid and the sale by it of ice cream products at such prices were made in good faith to meet the lawful and equally low prices of its competitors in the sale of ice cream products of like grade, quality and quantity and were

cream products in Mexico. In addition, Arden is the only manufacturer in California which produces or sells a patented product known as "diced cream."

There are various levels in the ice cream industry. One is known as "wholesale route-delivered customers," and another consists of the "distributors" or "jobbers." There is also an institutional type of ice cream customer known as "bid business."

Although, during World War II, there was a great increase in ice cream sales, after the war there was a marked de-

made by reason of competitive conditions herein found and other competitive conditions shown by the evidence in this action. * * *

"23. On and subsequent to November 21, 1949, several substantial competitors of Arden, Frigid and Holly-Maid published price lists at wholesale for and sold ice cream products in the Los Angeles area at prices lower than the prices established by and at which Arden, Frigid and Holly-Maid sold ice cream products of like grade, quality and quantity in the Los Angeles area on and after said date.

"24. Arden of Arizona manufactures ice cream products in Phoenix, Arizona, and all of the ice cream products it manufactures are sold by it within the State of Arizona. There are a number of other ice cream manufacturing plants in the State of Arizona owned by third parties and all of the ice cream products manufactured by said plants are sold in competition with the ice cream products sold by Arden of Arizona. The prices at which Arden of Arizona sold its ice cream products at wholesale from time to time were based on competitive conditions in the State of Arizona and upon its costs in said state. * * *

"25. In September, 1949, Arden of Arizona began the sale of Diced Cream at wholesale to its customers in Arizona. On or about said time, Arden of Arizona did not have a machine for packaging and processing Diced Cream but ordered such a machine the latter part of 1949, and it was installed in September, 1950. During the period of that time that Arden of Arizona was acquiring and installing its own machine for packaging and processing Diced Cream, it purchased Diced Cream from Arden. Arden of Arizona, in most instances, acquired said Diced Cream from Arden with its own trucks at the manufacturing plant of Arden in Los Angeles and in a few instances, Diced Cream was shipped by Arden to Arden of Arizona by public carrier f.o.b. Los Angeles. The price at which Arden of Arizona sold Diced Cream in the State of Arizona during the period of time it purchased Diced Cream from Arden was substantially the same as that charged by Arden and its ice cream distributing subsidiaries

in the State of California. At all times after September, 1950, Arden of Arizona has packaged and processed all Diced Cream sold by it in Arizona. No ice cream products sold by Arden of Arizona were transported across state lines other than the Diced Cream mentioned in this finding.

"26. * * * Each defendant manufacturing, distributing and selling ice cream products, in making each and every decision with respect thereto, and in the establishment of each and every price, acted solely upon its individual judgment and without agreement or understanding with or participation by any person, firm or corporation whether a defendant herein or not.

"27. The respective price reductions made by Arden, Frigid and Holly-Maid were not the result of any concert of action, combination in the form of a trust or otherwise, conspiracy, plan, scheme or agreement among the defendants, or any one or more of them.

"28. Each officer and director of Arden, each officer and director of Frigid and each officer and director of Holly-Maid who had anything to do with the respective price reductions of said defendants, in so acting did not act in an individual capacity but within the scope of and in the course of his employment as such officer or director. The decisions of the officers and directors of each of said defendants * * * was a decision with respect to a lawful business policy * * *.

"29. The respective price reductions of Arden, Frigid and Holly-Maid were not drastic, and the prices at which each said defendant sold its ice cream products on and after said respective price reductions were not unreasonably low. Said price reductions and each of them bore a realistic and reasonable relation to the previous price changes and the prices charged by their respective competitors in the ice cream products market in the Los Angeles area and in other areas in the State of California. * * *

"30. No defendant, in the doing of any act or acts herein found or shown by the evidence, was actuated by any purpose, design or intent to restrain, lessen,

crease for several years and keen competition prevailed in the Los Angeles area. Arden introduced diced cream in 1947, and plaintiffs claim Arden started an offensive to drive ordinary ice cream out of the market in June, 1949.

■ The first proposition is that the findings of fact were all in favor of defendants and against plaintiffs. We have examined the evidence and find that none of the findings was clearly erroneous.

Some of the factual contentions of plaintiffs, not proven to the trier of fact, follow.

It was claimed that Arden bought a large block of shares of preferred stock in the Shopping Bag Food Stores for

stifle, burden or otherwise interfere with trade or commerce between the several states, or any part thereof, in the manufacture, distribution or sale of ice cream products, and no part of said trade or commerce was unlawfully restrained, lessened, stifled, burdened or otherwise interfered with by any act of the defendants, or any one or more of them.

"31. No defendant, in the doing of any act or acts herein found or shown by the evidence, was actuated by any purpose, design or intent to prevent or destroy competition or to injure or destroy plaintiff or plaintiff's business or to exclude or eliminate plaintiff or any other person, firm or corporation from the business of manufacturing, distributing or selling ice cream products in the Los Angeles area, or in any other area, or in interstate commerce, or any part thereof. The Court makes no findings as to whether any act or acts of the defendants, or any of them, had any effect upon the business of plaintiff, or any profits derived therefrom, or caused plaintiff any injury, for the reason that the Court finds that all of the acts of the defendants complained of were legal.

"32. No defendant, in the doing of any act or acts herein found or shown by the evidence, was actuated by any purpose, design or intent to monopolize, nor did any defendant alone, or acting in concert, with others, attempt to monopolize the business of manufacturing, distributing or selling ice cream products in the Los Angeles area, nor any other area, nor in interstate commerce, or any part thereof. No defendant alone, or acting in concert among themselves or with others, monopolized or had the power to monopolize said business, or any part thereof. No act or acts herein found or shown by the evidence, of any defendant, has had or now has a tendency to create a monopoly in the ice cream products business in the Los Angeles area, or any other area, or in interstate commerce, or any part thereof.

"33. There are a number of ice cream manufacturing plants in Washington and Oregon owned by third parties and all of the ice cream products manufactured by said plants are sold at wholesale in competition with the ice cream products sold at wholesale by Arden in Washington, Oregon, Idaho, Montana and a small portion of Northern California served with ice cream products manufactured by Arden in Oregon. The prices at which Arden sold its ice cream products in Washington, Oregon, Idaho, Montana and the small portion of Northern California served with ice cream manufactured by Arden in Oregon at wholesale from time to time, were based on competitive conditions in said respective states and upon its costs in said respective states.

"34. The prices charged by any defendant manufacturing, distributing or selling ice cream products in any state referred to herein, has and had no effect on the prices charged by the said defendant, or any other defendant, or by any other person, firm or corporation, manufacturing, distributing or selling ice cream products in any other state. By reason of competitive conditions and variations in costs existing in the respective states, there is no reason for any similarity between the prices at which the respective ice cream products are sold in each of the said states.

"35. In September, 1947, Arden began the sale of Diced Cream in the Los Angeles area and since said time has continuously sold Diced Cream in said area. Diced Cream has not been sold by Arden in Oregon, Washington, Idaho or Montana. Shortly after Arden began the sale of Diced Cream in the Los Angeles area, certain of its competitors in said area also sold a package of ice cream, sherbet or ice milk containing a single serving. * * *

"36. No defendant or group of defendants in the Los Angeles area or in any area referred to herein, has or had a monopoly in the business of manufacturing, packaging, distributing or selling a packaged individual serving of ice cream. * * *

"37. The total quantity of Diced Ice

$200,000.00, and that, as a result thereof, this chain has sold Arden ice cream exclusively, while Balian, one of the plaintiffs, simultaneously lost the ice cream business of Shopping Bag. From this it was sought to make out a violation of 15 U.S.C.A. § 14. But the trial court found that Arden entered into no exclusive dealing contract with any of its customers, and the finding was not clearly erroneous.

It was contended that on Saturday, November 19, 1949, effective Monday, November 21, 1949, while continuing

Cream sold by Arden in 1949 and 1950 in the Los Angeles area was as follows:

1949 .......... 727,276 gals.
1950 .......... 580,032 gals.

* * *

"39. In 1949 Arden made a net profit on the manufacture, distribution and sale of ice cream products in the Los Angeles area of approximately $260,000.-00, and in the year 1950 Arden made a net profit on the same activities and in the same area of approximately $240,-000.00. Said profit was and is reasonable.

"40. There is no agreement, arrangement nor understanding between Arden and Shopping Bag Food Stores, referred to in the complaint as 'Shopping Bag Markets or Shopping Bag Companies,' nor between Arden and Mayfair Markets, referred to in the complaint also as 'Mayfair Companies,' nor between Arden and Godfrey Food Company, Inc., referred to in the complaint as 'El Rancho Market,' nor between Arden and any other person, firm or corporation in the Los Angeles area, or any other area, wherein the party other than Arden agreed to purchase all or any substantial part of its ice cream products from Arden, or wherein the party other than Arden agreed not to use or deal in ice cream products of any competitor of Arden or its ice cream distributing subsidiaries. * * *

"43. At all times here in question, the ice cream products manufactured by Arden in the State of Washington have been distributed and sold by it at wholesale in the States of Washington, Idaho and Montana; the ice cream products manufactured by Arden in the State of Oregon have been distributed and sold by it at wholesale in the States of Oregon and Washington and in a small portion of Northern California; and the ice

without change its prices in the northwest and Arizona, Arden cut the price of ice cream in the Los Angeles area with great secrecy. The price cut in ordinary ice cream supposedly was intended to convert customers to the use of diced ice cream, which, of course, cost more. Arden's Vice-President Tongue pointed out that the price of diced cream was not cut because "it is an article we were introducing into the market."

Plaintiffs contended they felt the price cut in two different ways. Quite a number of them attempted to maintain their

cream products manufactured by Arden in California have been distributed and sold by it at wholesale in the State of California. The total quantity of ice cream products (1) manufactured by Arden and transported by it across state lines for direct sale to wholesale route-delivered customers and (2) manufactured by Arden and transported by it across state lines to its own distributing plants in other states does not exceed 3.08% of the total quantity of ice cream products manufactured by it. Of said 3.08% of ice cream products only eight tenths of one per cent is transported by Arden across state lines for direct sale to wholesale route-delivered customers. Arden, in the manufacture, distribution and sale of ice cream products, was engaged in commerce among the several states.

"44. At all times here in question, the plaintiff manufactured, distributed and sold ice cream products at wholesale only in a portion of the Los Angeles area, and plaintiff, in the manufacture, distribution and sale of ice cream products, was not engaged in commerce among the several states. Plaintiff does not and did not at any time compete with any defendant herein selling ice cream products at wholesale in any area other than the Los Angeles area. * * *

"45. * * * Any such differential in price did not substantially lessen competition or tend to create a monopoly in ice cream products for Arden in either state where any such differential may have existed.

" * * *

"47. Plaintiff has not suffered any damage by reason of any act or acts of the defendants, or any of them, alleged in the complaint for which recovery can be had under any federal anti-trust statute or law.

" * * *."

volume by cutting prices in line with Arden. Others did not cut prices on certain items or did not cut prices sufficiently to hold their volume. In all cases plaintiffs claimed to have suffered extensive losses of revenue as compared with their operations at their price scale existing immediately before the price cut. Arden's revenue in the Los Angeles area was likewise reduced by the price cut. It was said that the price cut in late 1949 came at the most critical and difficult time of the year for those companies solely dependent upon ice cream. In the middle of July, 1950, several of the ice cream manufacturers and distributors made an effort, which was ineffectual, to restore their prices to the level existing before the cut.

It was also contended by plaintiffs that Arden was so fearful that its income would not keep up after the price cut that they discharged a great many salesmen from the ice cream sales department and reduced their refrigeration repair staff. A contention is also made that Arden pared down its ice cream advertising budget and cut mechanical cabinet expenses to the bone. Plaintiffs also claim that Arden was able to recoup its losses from other geographical areas and from profits from the sales of milk, cream, skim milk, powdered milk, butter, cottage cheese, eggs, salad dressing and related products.

The "blanket price cut," so called in this area, was unquestionably necessary in the opinion of Arden to eliminate a great many of the chiselling cuts, special advantages and rebates given by its competitors in this very area. It must be remembered that this was not a true blanket cut, since the diced ice cream was held at a high level. There seems to be but little doubt that Arden expected the price cut might cause it a loss on this particular brand of ice cream upon which it was required by the condition to keep the price up. Far from being impressed with the fact that Arden put on an austerity campaign in its own organization in the Los Angeles area and tightened its belt to meet competitive conditions over a large area, we conceive the circumstance seems rather to emphasize the fact that it was attempting to meet competition.

On October 11, 1950, one of the plaintiffs filed its action against Arden. A week later, Arden raised the price of some brands of ice cream, and in two further steps on December 15, 1950, and on January 13, 1951, increased its price to a level which is now apparently satisfactory to plaintiffs. The price war was thus at an end. Plaintiffs say that Arden was not in good faith in its concern about the loss of ice cream volume in this area and of certain combinations which tended to destroy its markets. Also, plaintiffs say it was not for the purpose of meeting the various devices of competitors and other lower prices introduced in the area and special favors given by others, but that the intent was to better the market for diced cream and to hurt their competitors financially.

■ The court, however, found that Arden had actually acted in good faith to meet the low prices of some of its competitors. This finding is not destroyed because it failed to introduce evidence of the quality of the product of the competitor or the quantity of the sales of the competitor. It was not incumbent upon Arden to establish, under the circumstances of this case, the lawfulness of the prices which it claimed to meet. And, even if Arden had gone beyond the technical limits of meeting an equally low price of a competitor and placed the price lower than any competitor, it would not have been a violation of this statute. The offensive action, which it is suggested Arden indulged in, means no more than that it did not actually put in effect a blanket price reduction, but excepted one, diced ice cream, from the cut. This was not evidence of offensive action, but one of the necessities of competition.

■ It is obvious that Arden, by selling ice cream products in the Los Angeles area at a lower price than it charged

for like products in other states, did not violate § 2(a) of the Clayton Act, as amended, 15 U.S.C.A. § 13(a).[2]

Plaintiffs' principal contention on appeal seems to be that, because they had an established price in the Los Angeles area at which they were making money, no one could cut the prices for the benefit of the public in that area unless it cut prices in every other area in which it did business. The implication of the arguments of plaintiffs is that prices can never be lowered by a concern, which does any interstate business, in one area if it fails to make a corresponding cut in every locality where it does business. This postulate need not be debated under the facts here. It may be said Congress did not put a floor under all existing prices so these could never be lowered by a firm doing interstate business. Certain economists contend for this construction. Such a situation would not be in the public interest. The people are interested in obtaining goods at the lowest price possible, if competition is not vitally affected thereby. The assumption suggested above would ring the death knell of competition. Even if it were shown that Arden undercut the prices of poorer quality products, it would not be unfair if the general purpose were to eliminate improper rebates and special concessions made by its competitors. Plaintiffs seem to urge as a defense that the prices which they were charging and the concessions which they made were in some instances illegal, but that, notwithstanding this fact, Arden could not fight against these by making a blanket cut on all ice cream sold in the area. But it is well established that "Congress did not seek by the Robinson-Patman Act either to abolish competition or so radically to curtail it that a seller would have no substantial right of self-defense against a price raid by a competitor."[3]

The court found also that there was no causal connection between the different prices of ice cream sold by Arden in Arizona, Washington and Oregon and any damage sustained by plaintiffs as a result of the lowering of prices in the Los Angeles area. There was absolutely no evidence in the record that the differentials as to sales in commerce or in other areas had any relation to any injury or damage which plaintiffs may have sustained. It is true that Arden in certain respects engages in interstate commerce, but it does not follow that the price differentials in different areas have any relation to each other, even if sales involving interstate commerce were given consideration. The finding of the court that the price differential between the different areas was not unfair as respects plaintiffs was well founded. The customers of Arden in the respective areas are not in competition with each other, and the products sold in each area are sold in competition with like products manufactured by others. The prices in each area are based upon the cost of production and competitive conditions based upon like products manufactured by others. Moreover, Arden had other competitors in the Los Angeles area besides plaintiffs. It did seventeen per centum of the business only. Therefore, Arden was doing business in a number of largely disconnected, homogeneous, competitive areas. There simply was no reason for uniformity of price throughout these areas. Any revenue loss to plaintiffs as a result of the lowering of prices is merely one of the results of local competition.

It is also broadly stated in the argument that a differential in price in and of itself constitutes discrimination within the meaning of § 2(a) of the Clayton Act, as amended.

But this postulate is universal, arrived at with insufficient bases. " 'Congress was dealing with competition, which it sought to protect, and monopoly, which it

---

2. Amended by the Robinson-Patman Act, June 19, 1936, c. 592, § 1, 49 Stat. 1526.

3. Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 249, 71 S.Ct. 240, 95 L.Ed. 239.

sought to prevent.' " [4] There is no presumption set up anywhere that, merely because there is a differential in various areas, necessarily a price discrimination exists.

Plaintiffs seem to urge that, as competitors, they were protected by the statute from any lowering of prices by Arden on its products over a local, intrastate area of California. Although it is admitted neither the materials nor the products so sold are shipped in interstate commerce, into which only three per centum of the products of Arden flow, the claim is made that Arden did not lower prices on products sold in local areas in other states far distant where entirely different competitive conditions prevailed. But it must be remembered that differentials are not proscribed in the language of the statute. The statute requires that there be some discrimination.

It must be noted that there was not here involved a differentiation between purchasers from Arden of goods shipped in interstate commerce where the purchasers were in competition among themselves. This feature indicates a variance from Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196. Arden did not embark upon a campaign by selling goods shipped in interstate commerce at a loss in a local area to punish or designedly try to cause loss to one weaker competitor. It had no design to eliminate such a competitor and put him out of business by giving guaranties against loss to its own sales customers. Therefore, the doctrine of Porto Rican American Tobacco Co. of Porto Rico v. American Tobacco Co., 2 Cir., 30 F.2d 234, has no relation to the situation here. Such a pattern is not entirely unfamiliar in the history of unfair competition in this country. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663.

And, clearly, Moore v. Mead's Fine Bread Co., 348 U.S. 115, 118, 75 S.Ct. 148, 150, does not apply, as there is no proof here of any destruction of competition or probability that any competitor would be destroyed or eliminated "as required by the amended § 2(a) of the Clayton Act". Also, the holding of that case with respect to § 3 of the Robinson-Patman Act, 15 U.S.C.A. § 13a, has no bearing here. As noted, there was an express finding of lack of "purpose of destroying competition, or eliminating a competitor". Consideration of § 3 is no longer involved in this case since plaintiffs do not challenge this finding.

█ But, even if discrimination be found, it is not in and of itself denounced, but only when deleterious consequences are probable, i. e., " 'where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them' ". 15 U.S.C.A. § 13(a), as quoted in Moore v. Mead's Fine Bread Co., 348 U.S. 115, 117, 75 S. Ct. 148, 149.

█ The difference in price between various states did not substantially lessen competition or tend to create a monopoly in ice cream products. There was no evidence that trade or commerce, interstate or otherwise, was lessened or burdened by any action of defendants in this case. The findings of the trial court expressly negativing the existence of any such consequences or a possibility of such results were supported by substantial evidence.

Balian complains only of revenue loss. But this is attributable solely to the intensely competitive Los Angeles ice cream market for which plaintiffs are partly responsible.

4. Staley Mfg. Co. v. Federal Trade Commission, 7 Cir., 135 F.2d 453, 455, cited and quoted in Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 249, 71 S.Ct. 240, 249, 95 L.Ed. 239.

 Plaintiffs complain that the District Judge required them to prove that defendants had an illegal intent to destroy competition, but this is not true. Of course, intent is not an essential factor to a § 2(a) violation, although, if the intent to destroy were found to exist, it might tend to render the injury probable. The court did find that no defendant did any act with intent or design to prevent or destroy competition in the ice cream products business or with intent to restrain or lessen trade or commerce between the several states. But this was made in negation of an allegation in plaintiffs' complaints charging such an intent and a conspiracy to carry it out.

It is clear, therefore, that the trial court was correct in holding that there was even prima facie no violation of the statute. But the court did not stop here.

There is an affirmative defense also given by the statute to defendants in the following terms:

" * * * nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price * * * was made in good faith to meet an equally low price of a competitor * * *." 15 U.S.C.A. § 13(b).

 The trial court made precise and exact findings covering this defense. It was found that the prices at which Arden sold its ice cream products in California were set up in good faith to meet the lawful and equally low prices of its competitors. Balian takes exception on two grounds: (1) that defendants were not put on proof with regard thereto; and (2) that the findings were incorrect. Where a case has been tried and the court makes findings of fact, it cannot be said that, as trier of the fact, he is not entitled to consider any evidence in the record by whomever adduced in arriving at this result. The burden of proof and burden of going ahead with the evidence are then procedural rules for the guidance of the trial court. There was a fair trial here. The findings are supported on this point by substantial evidence and must be sustained. So even if it were found that discrimination existed and tended to have the proscribed results, still the trial court found that the defense was established on the record.

 The exception for changing conditions affecting specific goods, which is supposed to provide a defense for price discrimination under the statute, has no application in the case at bar. 15 U.S.C.A. § 13(a). The trial court found that there was no joint action of Arden and its supposed satellites in depressing prices. Therefore, the action taken was not illegal per se under the Sherman Act or otherwise.

 The court also found that the action of defendants was not a violation of the California Anti-Trust laws. This action was brought under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. There was an attempt to join this cause with a cause under the diversity of citizenship provisions. One such cause in each case was brought only against the defendants as to whom complete diversity of citizenship between plaintiff and defendant exists. The causes based upon the Clayton Act were brought against all of the defendants. It is attempted to justify this joinder on the ground that the District Court had jurisdiction over the federal causes and therefore, under the doctrine of pendent jurisdiction, also had authority to hear this non-federal cause. However, such a contention is not well founded.

It is perfectly true that the history of competition in the United States furnishes many instances where consolidated corporations or so-called trusts have dropped prices in order to eliminate the individual competitor, and there is no doubt that one of the legislative purposes in the Clayton Act and the Robinson-Patman Act was to meet such unlawful activity. But this is not such a case.

The judgment is affirmed.