**B & W GAS, INCORPORATED**

v.

**GENERAL GAS CORPORATION and Master Mix Feed Mills of Georgia, Inc.**

**Civ. A. No. 1091.**

United States District Court
N. D. Georgia,
Gainesville Division.

Oct. 26, 1965.

John N. Crudup, Gainesville, Ga., for plaintiff.

Martin, Martin & Snow, Macon, Ga., Robinson, Thompson, Buice & Harben, Gainesville, Ga., for defendant general.

Erwin, Nix, Birchmore & Epting, Athens, Ga., for defendant Athens Poultry.

SIDNEY O. SMITH, Jr., District Judge.

Plaintiff, B & W Gas, Incorporated, hereafter referred to as "B & W" is engaged in the selling and delivering of liquified petroleum gas in 12 counties in northeast Georgia and has brought this action under Title 15 U.S.C.A. §§ 2, 13, 15 and 26 and Title 28 U.S.C.A. § 1337 in which it seeks both preliminary and permanent injunctive relief as well as damages against the defendant.

The defendant, General Gas Corporation, (also known as Tuloma, Inc.) referred to as "General" has a similar business to that of the plaintiff but it covers several states, including most of North Georgia and substantially all of the counties in which plaintiff does business. The defendant Athens Feed & Poultry Company, hereinafter referred to as "Master Mix" is engaged in the business of growing poultry and related activities in the Athens trade area, which involves

14 counties, all covered by General and 8 by B & W. Master Mix is a typical modern-day operation in the poultry business in that it grows its own poultry on a contract basis on premises owned by its growers by which Master-Mix following the sale of poultry products, deducts from the sale price, feed and other expenses incurred in the growing operation, and distributes, the balance to the grower as per contract.

A show cause order was issued by the Court and the matter came on for hearing on Monday, October 4, 1965, on the issue of preliminary injunction. Evidence was received by extensive oral testimony and supplemental affidavits. The matter was argued by counsel and the matter of the issuance or nonissuance of a preliminary injunction is now before the court.

The plaintiff contends that the defendant, General, is guilty of unlawful discriminations in price-cutting and that both General and Master Mix have entered into an unlawful agreement and arrangement for the growers of Master Mix to buy exclusively from General all of their LP gas needs.

The complaint as laid sets out a three-pronged attack on the defendants, alleging:

(1) That the defendant, General, has been guilty of predatory price cutting in that it reduced its price of LP gas from 17¢ to 15¢ per gallon only in B & W's trade area on or about August 20, 1965.

(2) That General and Master Mix entered into an alleged "tie in" to force the growers of Master Mix to buy exclusively from General.

(3) That General is furnishing free labor and material on all commercial installations and free tanks on all domestic installations only in B & W's twelve county trade area, which amounts to an illegal rebate to one class of customers.

PROLOGUE.

■■ At the outset, it should be realized that this case comes before the court with a background of intense competition in this particular business over the North Georgia area. Some of the same interested parties were before the court in 1959 with similar problems in General Gas Corporation v. National Utilities, 5 Cir., 271 F.2d 820 (1959) at which time the Fifth Circuit reversed the granting of a preliminary injunction by the District Court. As legal and factual precedent that case is persuasive in these proceedings. Likewise, the courts are most cautious in granting injunctive decrees on anti-trust matters and the burden for preliminary relief is far greater than that imposed for ultimate relief before a jury. Thus, "the burden is * * * a heavy one, and the injunction should not be granted or indulged in except in a case clearly demanding it." Hershel California Fruit Products Co. v. Hunt Foods, D. C., 111 F.Supp. 732. Whatever the test for a prima facie showing in the end, in an application for preliminary injunction the court must be satisfied not only that there has been price differential (two sales at different prices) but also that plaintiffs will have (1) *probable success* in ultimately proving violations of the anti-trust laws on trial and will suffer (2) *irreparable immediate damage* if the preliminary injunction is not granted. See Warner Bros. Pictures, Inc. v. Gittone, 3 Cir., 110 F.2d 292; Deltown Foods, Inc. v. Tropicana Products, Inc., D.C., 219 F.Supp. 887. These tests are apparently recognized in National Utilities, supra, by this circuit. In light of the above, we proceed to examine the evidence in this case.

(1) PRICE-CUTTING UNDER ROBINSON-PATMAN ACT.

Up until three or four years ago, the industry in the North Georgia area maintained a 2¢ price differential between so-called "domestic" and "commercial" customers.[1] However, substantially all dis-

---

1. At the time of National Utilities, it was 18¢ and 16¢ net, though some dealers were operating on a straight 17¢ price in the area.

tributors at that time arrived at a pre-vailing price of 17¢ to all customers, and this was the established price, not only in B & W territory but in the larger area covered by General, until 1964. Practically all dealers had special or "contract" customers who were granted lower prices, particularly in the sprawling broiler and layer operations throughout the area. These "special" customers receive now prices ranging from 10¢ (S. E. Hogan from Parr Gas) to 12.7¢ (McEver Packing from Childs Gas) to 14¢ (Lloyd Strickland from Mansfield Oil and Fincher Gas) (T. T. Folger from Hydratane and National Utilities). (Billy Spratlin buys at 15¢ from Sorrow and was offered gas at 14½¢ by Parr last winter and 15¢ by Athens in early spring.) "15¢ gas" could be found in many counties covered by General as far back as mid-1964 and has been prevalent in some counties covered by both parties since early 1965. Plaintiff itself had 16¢ contract customers, but had not cut any to 15¢ until the summer of 1965, when General openly announced a price cut of 15¢ for commercial users.

In the intense competition for these special (variously called "contract", "bid", or "quote") customers, the lines between commercial and domestic users became blurred and was complicated by the fact that poultry growers sometimes use the same gas out of one tank for residential as well as broiler purposes.

While General operates in several states, so far as this suit is concerned, the district has three offices: Anderson, South Carolina, Gainesville, Georgia, and Athens, Georgia. The Anderson office does not serve any of the counties affected, while Athens and Gainesville together serve some 18 counties.[2]

In plaintiff's trade area alone, there are, according to its President (Bennett), 16 competitors besides General, or a total of 18 companies competing for the LP gas business (2 more than in 1959). In at least 11 counties of General's Gainesville-Athens areas, though billing procedures varied, 15¢ net gas for all "commercial" customers was available from competitors of both parties, some since as early as 1963. In the past 12 months General has lost several hundred general commercial customers it had at 17¢ to 15¢ competition. Also, recently it lost a 15¢ contract customer at 14¢ (J. D. Jewell, Inc. to Mansfield). While the 15¢ commercial price was not available in all of the B & W area, it was in a part of it and, as seen, in a large part of General's area. In an attempt to standardize its prices and preponderately to meet existing competition, on August 20, 1965, General moved to return to the old 2¢ differential between domestic and commercial customers. Contrary to the allegation of predatory price-cutting, the new rates (17¢ and 15¢) were effective to all customers in all counties served by the Athens and Gainesville offices. (It had existed at Anderson since 1963). Since August 20, 1965, General has been involved in switching over its commercial customers to the new rate and in some instances rebating back to the effective date. However, as late as September 10, 1965, some commercial poultry customers of General were still being billed at 17¢

2. The counties covered are:

| General | B & W | General | B & W |
|---|---|---|---|
| Banks | Banks | Jackson | Jackson |
| Barrow | Barrow | Lumpkin | |
| Clarke | Clarke | Madison | Madison |
| Dawson | | Oconee | |
| Elbert | Elbert | Oglethorpe | Oglethorpe* |
| Forsyth | | Walton | |
| Franklin | Franklin | White | |
| Greene | | | |
| Gwinnett | | | |
| Habersham | Habersham | | |
| Hall | Hall | | |

* In addition, B & W serves Stephens and Hart. Its "best" counties are Madison, Franklin and Hart

(Madden, Elbert Co.). While this may be sufficient to prove the mandatory "two sales" test, it falls far short of making out a case of probable success.

"Cutting prices is not per se unlawful and will not supply intent which court must find in order to justify granting of preliminary injunction against price cutting allegedly directed toward destruction of competition and monopolization of interstate commerce." Hershel California Fruit Products Co. v. Hunt Foods, D.C., 111 F.Supp. 732.

■ The burden is on the plaintiff to show that any price cut is of this kind. Elgin Corp. v. Atlas Bldg. Products Co., 10 Cir., 251 F.2d 7(5); Balian Ice Cream v. Arden Farms Co., 9 Cir., 231 F.2d 356. This has not been done here. On balance, as to the price change, it appears to be justifiable as necessary to meet the equally low price of competition and entered upon in good faith by General in its entire trade area. As part of overall competition, B & W is only incidentally affected where its trade area overlaps.

Likewise, the plaintiff has failed to show any "immediate irreparable damage." As to financial data, the record is strangely silent as to both parties. B & W was identified as an "independent", while General was classified as a "major." The plaintiff relies heavily on commercial poultry consumers, approximately 50% of its business coming from that source. General does 15–20% of its business to commercial poultry growers in its Athens-Gainesville operations and estimates it has now 10% as much of that business as B & W in the B & W area. Since the open price cut by General it has lost "110,000 gallons of business, which represents 3% to 5% of its total." It could lose "15% to 20% or approximately 500,000 gallons." Plaintiff computes its loss exposure at 2¢ per gallon or a total of $10,000.00 for the 1965–1966 season. Its business is estimated to be worth 1½ million dollars. It is paying approximately the same price (6.67¢ per gallon) as its competition for wholesale gas (6¢ to 7¢). Its cost of doing business is another 6¢ per gallon and 1¢ per gallon for office overhead. Its "break-even" price is 15¢ per gallon. The difference is for "estimated other expense". The 15¢ price includes $30,000.00 in annual salaries to its stockholder-managers.

■■ Various other competitors testified that 15¢ was a break-even price,[3] though some had contracts at that price or lesser. Others freely sell at 15¢ and have been for some time.[4] Only one dealer testified that his break-even price was over 15¢, and that was 15.618¢ in 1964.[5] On the other hand, General's break-even price is 12¢. Suburban's price is a "secret", but estimated at 13.56¢ and 15¢ "would show a profit." The absence of audits or other financial data to determine the cost of doing business of any of the dealers renders a determination of loss virtually impossible by the court. As one witness (Rasmussen) stated, management would be the deciding factor in determining whether a reasonable profit could be made at 15¢. While B & W might show a loss at *less than 15¢*, the mere fact of loss of profits or economic injury resulting from a competitive situation does not, in and of itself, entitle one to relief. Gerber Products Co. v. Beech-Nut Life Savers, Inc., D.C., 160 F.Supp. 916. Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise. Atlas Bldg. Products v. Diamond Block & Gravel Co., 10 Cir., 269 F.2d 950 at page 954. Nor should a violation rest upon conjecture as to what a competitor might do, particularly in the absence of a showing of aid to the price cut from another market of the defendant. See Anheuser-Busch, Inc. v. F. T. C., 7 Cir., 289 F.2d 835, 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385.

3. Fincher Gas, Inc.; Savannah Valley Gas Co.; Northeast Ga.—Green's Fuel Co.; Athens Gas Service; Child's Gas Co.

4. Suburban Gas; Gas, Inc.; Georgia Hydratane; Sorrow Gas.

5. Mansfield Oil Co., whose President hoped to do better in 1965.

All in all, a showing of loss in the legal sense is uncertain. With an estimated total reduction of $10,000.00 in business to a comparatively large independent company estimated to be worth 1½ million, (which has itself cut to 15¢ to hold some customers now), the "immediate irreparable damage" is not shown to the satisfaction of this court. This is particularly true since the case would normally be ready for trial in April, 1966.

## (2) CONTRACT IN RESTRAINT OF TRADE UNDER CLAYTON ACT.

For several years, some large feed dealers, or contract customers, have purchased LP gas at less than the prevailing price. In most instances, gas deliveries are made to the individual grower. The gas distributor is paid monthly by the feed dealer and the cost "charged" to the grower's account as part of his contract expense. In some instances, 14¢ gas has been charged back with a handling fee of 1½¢ to 2¢.[6] Master Mix is a large dealer, having over 300 growers in 14 counties. Prior to 1965, it did not follow this practice. Each of its growers purchased his own gas in the open market and paid for the same out of his own share of the contract earnings. As a result, it had little or no knowledge of fuel consumption necessary to grow its chickens, except that it varied from $8.00 to $25.00 per 1,000 between growers. In order to promote efficiency,[7] to obtain complete records and hopefully to obtain a price advantage for its growers, it entered into an arrangement with General Gas in July, 1965. Under the terms of the agreement, Master Mix was to promote the use of General's gas among its growers and to pay for the same at prevailing market price (then 17¢); its growers were to receive competitive prices and periodic automatic equipment checks from General. In return, General was to send records of all gas purchases by each grower to Master Mix and receive Master Mix's check for the total grower purchases. As payment for sales, billing, and collection services, Master Mix was to receive 10% of the total purchases of its growers. This agreement was loosely discussed in early summer of 1965 and effectuated on July 7th. Master Mix (whether aware of its competitor's practices or not) desired to stay out of the pricing field and obtained General's guarantee of competitive prices. During its negotiations with several gas distributors, Master Mix discussed price with B & W, which offered to bill at a flat 17¢ and to pay 2¢ to Master Mix for sales, billing, and collection services.

When 15¢ gas became available to some of its growers, General was notified and the 15¢ gross price was announced to all growers by bulletin distributed the week following April 20, 1965.[8] This occurred, even though the price cut meant a monetary reduction in discount to Master Mix for handling. Thus far, the program has had only mild success. Of over 300 growers, only 12 switched to General at

6. Chestnut Mountain Hatchery buys at 14¢ and charges at 16¢. Dahlonega Feed & Poultry buys at 14¢ and charges at 15½¢, including state sales tax.

7. It is a fact that the feed-conversion, i.e. pounds of feed necessary to produce a pound of chicken, is increased if insufficent fuel is used in the winter months.

8. Plaintiff's Exhibit #2, which states in part.
    "There is quite a bit of misunderstanding concerning our talking with you about changing from your present gas company to General Gas. Naturally we expected a reaction from the other gas companies. We did not say anything against them.

By an large we felt that you were with them by your own choice. We still have nothing against any of them. But we feel even stronger now than ever that once we start working together more and more with one company, the more benefits you will receive. In the short time we have been working with General Gas, we have already received a 2¢ per gallon reduction in gas price. They told me last Friday that the price will be 15¢ per gallon to everyone regardless of the area in which you live. This alone should be proof enough to all of you what can be done by us all working together. But I can assure you this is only one of the beginning benefits.

17¢ between July 7th and August 20th, and only 24 switched at 15¢ between August 20th and October 4th, or a total of 36 growers in all.

More significant, there is no evidence of compulsion on the Master Mix Growers. Of the seven Master Mix growers who testified,[9] not one testified as to any threat or force being placed on them. On the contrary, the motivation appeared to be a desire to cooperate and, of course, the eventual price benefit to them.

As can be seen, the arrangement between General and Master Mix is, in reality, one between distributor and customer and not between "two sellers competing for the same customers." It is no more and no less than what had been done by General's competitors with other large customers, though executed by a "discount" instead of a "mark up" on the part of the customer-dealer.

■ The agreement does not provide for nor is it being administered to exact a promise of gas purchases for broilers on the part of General and/or Master Mix. Thus, it does not constitute a "tying arrangement" condemned by the law. See Susser v. Carvel Corporation, 2 Cir., 332 F.2d 505; Osborn v. Sinclair Refining Co., D.C., 207 F.Supp. 856.

The 15¢ price was not restricted to Master-Mix's growers, but was a general price cut throughout the area to all poultry and/or commercial consumers. Also, competitive prices are available to both Master-Mix and its growers from the entire industry.

■ It has been seen that the price-cut of General, whether effected through the arrangement with Master-Mix or without, is not unfair competition. Likewise, the arrangement between the two in itself does not constitute an illegal combination in restraint of trade or an unreasonable interference with the ordinary, usual, and freely-competitive pricing or distributive system of the open market. See United States v. Reading, 226 U.S. 324, 369, 33 S.Ct. 90, 57 L.Ed. 243; Standard Oil Co. of New Jersey v. U. S., 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; Gold Fuel Service, Inc. v. Esso Standard Oil Co., 3 Cir., 306 F.2d 61.

(3) INDIRECT REBATES UNDER ROBINSON-PATMAN.

■ Plaintiff contends that General is furnishing extra labor in customer installations in its trade area only, which amounts to an indirect price cut. While this could constitute an unfair practice (See Callman, Unfair Competition and Trade Marks, Vol. 1, Section 8.2), no evidence was offered to show either that special installation was furnished any customer over another, or that special installation was furnished only in B & W's trade area. On the contrary, the record indicates that all of the competitors furnish the same or similar installation (tanks, etc.) to all customers over the entire area.

■ It has been stated that "the purpose of the anti-trust laws are to preserve and advance our system of free, competitive enterprise; to encourage, to the fullest extent practicable, free and open competition in the market place; and to prevent the accomplishment of a monopoly in any business or industry; all to the end that the consuming public may receive better goods and services at a lower cost." See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S. Ct. 259, 95 L.Ed. 219 and cited cases. The "public interest" is a proper consideration for the court on application for injunction. See General Gas v. National Utilities of Gainesville Inc., 5 Cir., 271 F.2d 820 at 824. To deny the right of the public to have benefit of every legal price cut is to be avoided if at all possible. In the liquefied petroleum gas market in North Georgia, unfettered competition, in spite of increased costs, has produced a 1¢ net reduction to the consuming pub-

9. Miller, Irwin, W. D. Graham, C. W. Graham, Board, Woody, Ritchie. The Grahams switched at 17¢. Ritchie stayed with B & W. The rest switched after the 15¢ price cut. All testified that they were advised they "could decide on their own", "didn't have to do it", "were requested but not forced", etc.

lic in six years.[10] At the same time new independent competition has come into the market and succeeded in obtaining 500,000 to 1,000,000 gallons in two to three years. Under the circumstances, a premium is placed on successful management with the public as beneficiary. Perhaps the situation has now reached the point of maximum public benefit without economic ruin to the sellers. In any event, it would be ill-advised for the public and unfair to only one of the many competitors to enjoin the price cut attacked here on the basis of the present record.

All of this is not to say that the plaintiff cannot eventually prevail, but decidedly to state that it has not carried the heavy burden required for temporary injunctive relief. Accordingly, the prayers for the same are DENIED.

It is so ordered.

---

10.  18¢ and 16¢ net in 1959 to 17¢ and 15¢ net in 1965.