CARLSON COMPANIES, INC., et al.,
Plaintiffs,

v.

The SPERRY AND HUTCHINSON
COMPANY, Defendant.

No. 4–72–Civ. 327.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 21, 1973.
Supplemental Opinion.
Feb. 7, 1974.

Matthew J. Levitt and J. Patrick McDavitt, Levitt, Palmer, Bowen, Bearmon & Rotman, Minneapolis, Minn., Donald J. Gavin and John Bodner, Jr., Howrey, Simon, Baker & Murchison, Washington, D. C., for plaintiffs.

Edward C. Stringer, Briggs & Morgan, St. Paul, Minn., William E. Kelly, Casey, Lane & Mittendorf, New York City, for defendant.

## MEMORANDUM

## ORDER

LARSON, District Judge.

Carlson Companies, Inc., (Carlson) and thirteen of its subsidiaries have filed suit in this Court under §§ 4 and 16 of the Clayton Act, as amended [15 U.S.C. §§ 15 and 26 (1973)] for damages and injunctive relief under §§ 1 and 2 of the Sherman Act, as amended, [15 U.S.C. §§ 1 and 2 (1973)] and § 7 of the Clayton Act, as amended [15 U. S.C. § 18 (1973)].

In an Order dated October 5, 1973, this Court denied defendant's motion to compel discovery regarding: 1) Carlson's estimate of its share of the trading stamp business; 2) Carlson's tax payments and the tax payments of its subsidiaries; 3) Carlson's loan program; 4) Carlson's acquisition program; and 5) Carlson's subsidiaries not directly related to the trading stamp and related premium and incentive business. In a motion heard on October 19, 1973, The Sperry and Hutchinson Company (S &

H) urged this Court to vacate its previous Order of October 5, 1973, or, in the alternative, to certify the matter to the Court of Appeals. In a separate hearing before this Court on November 5, 1973, the Court was asked to rule upon motions by plaintiffs for partial summary judgment and for a preliminary injunction, and a motion by defendant to strike the testimony of two experts presented by plaintiffs in support of their motion for a preliminary injunction.

This memorandum opinion will be directed toward all issues raised to date. Because the Court's Memorandum Order of October 5, 1973, must be modified in certain respects, this Court considers it simpler at this juncture to withdraw its previous opinion and to substitute a corrected opinion that will cover the most recent motions as well as the motion to vacate. In conjunction with the modified opinion, defendant's motion to certify the opinion of October 5, 1973, pursuant to 28 U.S.C. § 1292(b), is denied.

I. *Discovery—Defendant's Motion to Vacate the Order of October 5, 1973.*

A. *Estimate of Carlson's Share of the Stamp Market.*

In its amended complaint Carlson has alleged at paragraph 26 that "S & H has monopolized the national trading stamp market" and that "[i]t currently accounts for more than 70 per cent of the non-captive trading stamp market in the United States." Defendant's interrogatory 21 asks that plaintiffs state their estimate of their share of the trading stamp market in the United States, in each State, and in various cities. Defendant argues that "[d]efendant is entitled to know the full extent of plaintiffs' estimations and particularly plaintiffs' estimate of the extent of their own market shares." Defendant's Memorandum in support of its motion to compel answers, at 18. Plaintiffs have replied that "[p]laintiffs are obliged to produce facts, not guesses." Plaintiffs' Memorandum in opposition to defendant's motion pursuant to Rule

37(a), at 23. It is not clear whether plaintiff does, indeed, have an estimate of its share of the trading stamp industry. 4 J. Moore, Federal Practice Par. 26.56[3], at 26–160 (2d ed. 1972), indicates that at least prior to the 1970 amendments to the discovery rules, most courts rejected discovery requests for opinions. Moore indicates at 26–164 that:

"[t]here is nothing in the language of Rule 26(b) to require a decision that matters of opinion may never be called for. The question should be, not whether as a theoretical matter the inquiry calls for an expression of opinion, but rather whether it is practicable and feasible to answer the inquiry and, if so, whether an answer might expedite the litigation by either narrowing the area of controversy or avoiding unnecessary testimony or providing a lead to evidence."

Judge Bryan in Broadway & Ninety-Sixth St. Realty Co. v. Loew's Inc., 21 F.R.D. 347 at 359–360 (S.D.N.Y.1958), recognized the need to allow opinions to be elicited during discovery procedures whenever the answers might serve some legitimate purpose such as leading to further evidence or narrowing the issues. Cases to the same effect are cited at the pages indicated. In the instant case, while it would surely be possible for plaintiffs to indicate their estimate of their share of the stamp market if known, or guess as to their share if a precise figure is unknown, defendant has given no indication of the need for or significance of the requested information. It is difficult to fathom how plaintiffs' estimate would in any way lead to possible other information that would be of use to defendant or to a narrowing of the issues in this case. Therefore, the request for plaintiffs' estimate of their share of the trading stamp market is again denied.

### B. *Carlson's Tax Payments.*

Defendant S & H in interrogatories 3 and 6(k) has requested a list of the jurisdictions to which Carlson and its subsidiaries and affiliates have paid taxes, along with the type and amount of tax paid in each jurisdiction. The professed purpose of making this request was to "determine the extent of plaintiffs' 'nationwide' trading stamp business. The payment of income taxes would be clear evidence of the geographical scope of their business and easy to produce." Defendant's Memorandum, *supra*, at 10. Plaintiffs reply that such production is burdensome and unnecessary because plaintiffs have already delineated the extent of their trading stamp business in response to interrogatory 6(h), (i), and (j), and in answers to questions posed at the Johnson deposition. Carlson alleges in addition that "in response to S & H's document requests, plaintiffs have produced documents listing, by geographic area, all trading stamp accounts, giving S & H a complete picture of plaintiffs' business." Plaintiffs' Memorandum, *supra*, at 16–17.

S & H is correct in its assertion that tax records must be made available under appropriate circumstances. Indeed, three cases from this District—Lind v. Canada Dry Corp., 283 F.Supp. 861 (D. Minn.1968); Karlsson v. Wolfson, 18 F. R.D. 474 (D.Minn.1956); and Volk v. Paramount Pictures, Inc., 19 F.R.D. 103 (D.Minn.1950)—all support that proposition. None of the cited cases, however, involved access to tax documents when other information was available that would serve the purpose of the person seeking their production. In Volk v. Paramount Pictures, Inc., *supra*, the defendants sought the tax documents because "verity which may be expected in income tax returns will be of indispensable value in reconciling or explaining or throwing light upon the many irregularities and inconsistencies disclosed in the books and records heretofore made available by plaintiffs." 19 F.R.D. at 104. In both Lind v. Canada Dry Corp. and Karlsson v. Wolfson, *supra*, the records were sought to verify a plaintiff's prior income in a personal injury claim for lost earnings.

Defendant has not made a convincing showing that the circumstances are appropriate in this case to burden the plaintiffs with the production of documents, the contents of which will possibly serve only to supplement material already revealed to S & H by Carlson. While the tax documentation may reveal with microscopic precision the areas in which plaintiffs and defendant "lock horns," the added benefit of more detail, if any, to be provided by such records is outweighed by the burden imposed upon plaintiffs were they required to make the production.

### C. Carlson's Loan Program.

#### 1. The Record in Fortner.

The focus of the briefs and arguments before the Court in the October 19, 1973, hearing on defendant's motion to vacate was this Court's interpretation of Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). As defendant correctly points out, this Court's reasoning was based upon assumptions about the state of the record before the Supreme Court in Fortner and conclusions that could be drawn therefrom. This Court stated in its Memorandum Opinion, at 5:

"The Court was apparently dealing with a record that did not indicate that U.S. Steel had made similar deals with any buyers except Fortner. See Advance Business Systems and Supply Co. v. SCM Corp., 415 F.2d 55, 67 (4th Cir. 1969). The question was therefore raised whether U.S. Steel did command sufficient economic power to make the loan arrangement illegal. At that point, and only then, did the Court begin to use the language concerning the 'uniqueness' of the loan arrangement available to Fortner. 394 U.S. at 504, [89 S.Ct. 1252]. Had the record shown that U.S. Steel was engaged in a widespread program of tying arrangements whereby advantageous loan terms were offered under the condition that the borrower would have to use U.S. Steel's prefab-

ricated homes, the Court could then have turned to the criteria of the power to impose a tie-in 'with respect to any appreciable number of buyers within the market' . . . ."

In its moving papers and oral argument concerning the motion to vacate, defendant has clarified the state of the record before the Supreme Court and demonstrated that there was a program of extensive loan activity and evidence of other tying arrangements that went beyond the program involving Fortner itself. Counsel for plaintiff argues that the evidence before the Supreme Court as cited by defendant is ambiguous as to whether the loans offered "were the same type of loans that Mr. Fortner was trying to invalidate with respect to himself and the Credit Corporation." October 19, 1973, transcript at 40. The evidence, however is clear as to the Supreme Court's awareness of a broad scale program of loans of some type attached to sale of U.S. Steel products with tie-in provisions. The Court in Fortner at 394 U.S. 502, at 89 S.Ct., recognized the broad program:

"In the present case, the annual sales allegedly foreclosed by respondents' tying arrangements throughout the country totaled almost $4,000,000 in 1960, more than $2,800,000 in 1961, and almost $2,300,000 in 1962."

Thus the Court at least had before it a record with evidence of an alleged foreclosure of over $9,000,000 in sales.

Given the clarified state of the record in Fortner, this Court must reexamine the Supreme Court's language in that opinion. Because of the evidence before the Court, it now appears as if the discussion of "uniqueness" entertained by Mr. Justice Black in 394 U.S. at 502–506, 89 U.S. 1252, was meant to apply in a case even where allegations and evidence indicate a large number of tying arrangements and the foreclosure to competitors of considerable economic resources. In referring to this extended analysis by Mr. Justice Black, the Sixth Circuit Court of Appeals in Fortner En-

terprises, Inc. v. United States Steel Corp., 452 F.2d 1095 (6th Cir. 1971), states:

"As we read the majority opinion in *Fortner*, the holding was that a tying arrangement achieves an unlawful restraint when 'the seller can exert some power over some of the buyers in the market.' The majority opinion did not hold that the acceptance of the tie-in by customers without more is proof of economic power. If the majority had intended to indicate that acceptance of a tie-in by an appreciable number of customers is sufficient proof of the requisite economic power, it would have been sufficient for Mr. Justice Black to have said so and thus to avoid the exhaustive treatment which he gave to the question of economic power in the tying product set forth in other portions of his opinion." 452 F.2d at 1103.

Based upon the quoted language, the Sixth Circuit disagreed with the Court's reasoning in Advance Business Systems and Supply Co. v. SCM Corp., 415 F.2d 55, 68 (4th Cir. 1969), that

"the 'sufficient economic power test' of *per se* illegality is satisfied when it appears that the seller has the power to 'impose other burdensome terms such as a tie-in with respect to any appreciable number of buyers within the market.'" 452 F.2d at 1103.

The *Advance Business Systems* case, as did our earlier opinion, relied upon the supposed absence in the Supreme Court record of other tying arrangements besides the one involving Fortner and arrived at a similar conclusion, *i. e.,* that since "no inference could be drawn from a single buyer's acceptance of a tie-in" the Court was compelled to base its finding of economic power "on a factual assessment of the product's 'uniqueness' and 'desirability' rather than on mere success in imposing the tie-in." 415 F. 2d at 67–68. Upon this Court's recon-

sideration of the Supreme Court's analysis in view of the record that it had before it, this Court now adopts the view of the Sixth Circuit that the fact of mere acceptance of a tie-in by an appreciable number of buyers by itself is not a sufficient showing of "economic power" to satisfy the *per se* test. Therefore, this Court's reliance upon the *Advance Business Systems* case and Mc-Mackin v. Schwinn Bicycle Co., 354 F. Supp. 1154 (N.D.Ill.1973), which in turn relies upon the *Advance Business Systems* interpretation, was misplaced.[1]

*2. Market "power" or "leverage."*

Having determined that a count of the number of tying arrangements or the dollar volume of sales foreclosed is not enough of itself to find economic power, it is necessary to review the cases for a determination of the correct standard to employ. As the memorandum opinion of October 5 indicates, this Court is not unmindful of the Supreme Court's general condemnation of tie-in arrangements as having a "pernicious effect on competition." Hence, "tying arrangements fare harshly under the laws forbidding restraints of trade." *See* Northern Pacific R. Co. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), and reference to that decision in *Fortner* at 394 U.S. 498–499, 89 S.Ct. 1252. Both *Northern Pacific* and *Fortner*, however, require a showing of market power or leverage before a tying arrangement is condemned. The Court in *Northern Pacific* points out that:

"[W]here the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most." 356 U.S. at 6, 78 S.Ct. at 519.

---

1. Note, however, that in *McMackin* the Court recognizes that the proven tie in must be demonstrated to be "burdensome", i. e., that it has in some sense injured the plaintiff in his business or property. 354 F.Supp. at 1156.

In *Northern Pacific* the defendant imposed an illegal tying arrangement through its disposal of ownership of several million acres of land. While the Court said that "[t]he very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power," 356 U.S. at 7–8, 78 S.Ct. at 519, the Court earlier had indicated that the possession of substantial economic power was "by virtue of its extensive landholdings which it used as leverage to induce large numbers of purchasers and lessees to give it preference." 356 U.S. at 7, 78 S.Ct. at 519. Thus, while the existence of many tie-ins is compelling evidence, the essence of the Court's decision is based not on the number of ties, but on the leverage—the power—to impose burdensome terms on the purchasers and lessees. Similarly in *Fortner* the Court refers to "market power" as "the ability of a single seller to raise price and restrict output" and the ability to force buyers to accept a tying arrangement that would prevent free competition rather than raising the price of its product. 394 U.S. at 503–504, 89 S.Ct. 1252. In view of the language above within the context of the cited cases, in order for an illegal tying· arrangement to be shown, there must be proof of leverage within the market; that is, power to make buyers accept the tied product for reasons other than the merits of the product. A showing that a tie-in existed but that the tie-in in no way affected the buyer's choice to accept the tied product would not amount to a violation of the Sherman Act regardless of the number of tie-ins involved.

3. *"Uniqueness" as an Indicator of Economic Power.*

In analyzing the "economic power" requirement for a finding of a Sherman Act antitrust violation, the Court in *Fortner* adopted the "uniqueness" standard that had been enunciated in earlier cases involving patents, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), copyrights, United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), or land, Northern Pacific R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The uniqueness criterion had not been doctrinally difficult to apply because of the traditional unduplicative qualities of a legally protected quantity—patents or copyrights—or a separate physical quantity —land. In considering the uniqueness of Fortner's loans, however, the Court was dealing with the new area of economic uniqueness. In *Fortner*, the Court indicated that barriers may result from the inability of competitors to produce the distinctive product profitably and that economic power is conferred "only when other competitors are in some way prevented from offering the distinctive product themselves." 394 U.S. 505, n. 2, 89 S.Ct. 1259. Thus it becomes apparent that the court in an economic uniqueness case must look to the economic ability of competitors to offer similar programs before an antitrust violation may be found. It would appear, therefore, that until there is an opportunity to assess the ability of a competitor to offer similar loans in a situation such as that before the Court, it would be impossible as a matter of law to hold that there was a violation of the antitrust laws. As in *Fortner*, where the Court left proof of questions of fact relating to a *per se* violation to trial, so here more evidence must be adduced before a determination may be made.

Because of the Court's pronouncement in *Fortner* concerning the need·to assess uniqueness by comparing defendant's economic offerings with those of competitors, answers to ·interrogatories, document requests and deposition questions concerning Carlson's loan program should be answered.

D. *Carlson's Acquisition Program and its Subsidiaries not Directly Related to the Stamp or Related Premium and Incentive Businesses.*

While the two elements grouped in this category were treated separately in this Court's Order of October 5, 1973,

certain elements of the two lend themselves to simultaneous treatment. In its discovery program, S & H has sought information regarding all subsidiaries of Carlson including those which do not directly engage in the trading stamp or related premium and incentive businesses. In addition, S & H has sought through interrogatories and document requests information concerning Carlson's acquisition program. Interrogatory 17 (page 12) seeks information regarding "each trading stamp service licensee or customer" in which Carlson has acquired "a stock or other equity or ownership interest or a contractual right to acquire such an interest." Interrogatory 18 (page 12) requests information regarding the location of documents pertaining to acquisition of "a stock or other equity interest" or assets of trading stamp companies other than those which issue Gold Bond Stamps. It asks in addition for information concerning documents pertaining to assumption of liabilities of such companies and the switch of such stamp companies to Gold Bond Stamps. In addition to Document Request 12, which is granted above to the extent that it requests discovery of Carlson's loan program, Document Request 16 seeks all documents relating to the acquisition of stamp companies. Document Request 17 seeks documents pertaining to internal considerations by Carlson in making all of its acquisitions.

S & H in its briefs and oral argument has presented two reasons to justify such broad discovery. Defendant first maintains that information regarding those companies into which Carlson has channelled its financial resources is relevant to the question of plaintiff's ability —or consciously created inability—to engage in loan programs to customers. Defendant's rationale is that whatever money Carlson has diverted from the stamp business to unrelated businesses has been taken away from Carlson's stamp business. Thus, S & H argues, Carlson's ability to grant loans, and to compete as a stamp company has been impaired. More generally, S & H argues that because Carlson has alleged that defendant has erected barriers to competition, an over-all view of the Carlson enterprise is justified so that S & H may see how Carlson has met the competitive challenge.

Because of this Court's view of the relevance of information concerning Carlson's loan program, all information regarding acquisitions of subsidiaries which engage in the practice of providing Carlson's customers with loans is clearly relevant and should be disclosed.

Both parties have produced numerous sources which reveal the competing interests governing the scope and relevance of discovery. Indicative of those interests is Kainz v. Anheuser Busch, Inc., 15 F.R.D. 242, 248 (N.D.Ill.1954), cited by both parties as support for their respective positions that "the fact that interrogatories may be burdensome is alone not enough to excuse a party from answering," 15 F.R.D. at 247, but that "caution must be exercised to assure that discovery techniques are not made instruments of oppression." 15 F.R.D. at 248. 4A J. Moore, Federal Practice Par. 33.02, at 33–17 (2d ed. 1972), indicates that a liberal interpretation should be accorded the discovery rules in order to provide the parties with the fullest knowledge of the facts as well as to clarify and narrow the issues; however, Moore indicates as well that scope and use of discovery is within the discretion of the court. See Newell v. Phillips Petroleum Co., 144 F.2d 338, 340 (10th Cir. 1944).

■ Clearly, those requests that relate to information unquestionably relevant to the legal issues raised in a case should be honored. However, when the requests approach the outer bounds of relevance and the information requested may only marginally enhance the objectives of providing information to the parties or narrowing the issues, the Court must then weigh that request with the hardship to the party from whom the discovery is sought. As the Court indicated in Jones v. Metzger Dairies, Inc., 334 F.2d 919, 925 (5th Cir.

1964), cert. denied 379 U.S. 965, 85 S.Ct. 659, 13 L.Ed.2d 559 (1965):

> "Full and complete discovery should be practiced and allowed, but its processes must be kept within workable bounds on a proper and logical basis for the determination of the relevancy of that which is sought to be discovered."

■ Given the above broad framework, and without further burdening the parties with the myriad of additional case citations which work variations upon the stated general principles, it is necessary to place defendant's requests and its justifications for such requests into perspective. Plaintiffs have alleged monopolization of the national stamp market and submarkets as well as illegal tie-in loan programs, unlawful payments and acquisitions, and various discriminations in price, terms, and conditions. Defendant, on the basis of those allegations, seeks the discovery requested for the reasons, as stated earlier, that diversion of money into non-stamp related subsidiaries and other acquisitions has taken money which could have been placed in Carlson's stamp program in order to more efficiently keep up with S & H, and that defendant is entitled to an overall view of how Carlson has met the competitive challenge. Counsel, however, has not provided this Court with any authority which would indicate the justification for such broad discovery. Defendant would have this Court look to Burroughs v. Warner Bros. Pictures, Inc., 12 F.R.D. 491 (D.Mass.1952), in which plaintiff alleged that defendants had combined and conspired to restrain trade and to monopolize the motion picture industry. The defendants objected to plaintiff's discovery regarding general corporate history of defendants, the relationship of defendant to its subsidiaries, names of theaters owned or leased by them, and financial information, on the grounds that the action was local and inquiry beyond the immediate geographic area was irrelevant. The Court allowed the discovery.

> "As to the conspiracy and combination thus charged, the information requested in these interrogatories is clearly relevant. The size of defendants, the amount of their business, the degree of integration between them, their relationship to other companies in the industry, the nature of their operations over an extended period of time are all factors which have a bearing on their power or their intent to dominate or monopolize the industry." 12 F.R.D. at 493.

It is important, first of all, to recognize that in *Burroughs*, discovery was allowed concerning activities of the defendant alleged to have committed antitrust violations. Here the party of whom discovery is sought are the plaintiffs. Second, and more importantly, the discovery in *Burroughs* went to the specifics of the charges alleged—combinations and conspiracy to monopolize—while here the discovery is aimed only at the broad ability of Carlson to keep up with S & H. Moreover, the Carlson complaint goes to monopolization of and restraint of trade in the trading stamp business, in part due to alleged illegal loan practices. This Court has already indicated that discovery of Carlson's loan program must be allowed. Furthermore, it recognizes that information pertaining to Carlson's stamp related businesses and stamp acquisitions are relevant and discoverable because of their obvious applicability to defining each party's share of the market, and while "practical considerations dictate that the parties should not be permitted to roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so," Broadway & Ninety-Sixth Street Realty Co. v. Loew's Inc., 21 F.R.D. 347, 352 (S.D.N.Y.1958), information pertaining to all aspects of plaintiffs' stamp and related premium and incentive business and acquisitions are relevant since such information may "lead to the discovery of admissible evidence." Rule 26(b)(1). To attempt, however, to extend the scope

of inquiry to all enterprises and non-stamp related acquisitions of Carlson would disrupt the processes of discovery envisioned in the Federal Rules and would serve only to delay the course of this lawsuit and unduly burden the plaintiffs.

In view of the foregoing, therefore, this Court holds that a revelation of Carlson's interests or acquisitions pursuant to interrogatory 17 (page 12) which are unrelated to either the issuance of loans or the business of trading stamps and the related premium and incentive businesses is not required under the rules of discovery or the antitrust law. However, in view of the discovery policies of allowing discovery where such discovery may lead to the revelation of admissible evidence as well as the relevance in determining the extent and character of plaintiffs' stamp program in relation to defendant's share of the market, this Court holds that interrogatory 18 (page 12) should be answered and documents requested in Document Request 12 to the extent that such documents may relate to either loan or stamp and premium and incentive business related acquisitions and Document Request 16 should be produced. In addition, documents in Document Request 17 should be produced relating to companies involved in 16 and to the extent that information requested in 17 is not covered in 16.

█ Plaintiffs have argued that acquisition of captive trading stamp companies is not relevant to the issues before the Court. If, however, plaintiffs have acquired one or more captive stamp companies, such acquisition is relevant in regard to an assessment of each party's share of the trading stamp market. Therefore Carlson should produce information regarding all of its stamp acquisitions, not merely those which Carlson has categorized as independent.

II. *Motion for Partial Summary Judgment.*

Carlson has filed a motion under Rule 56 requesting this Court to grant partial summary judgment declaring that defendant's customer loan program and other financial activity which conditions financial assistance to trading stamp customers on the use of S & H Green Stamps is unlawful. Carlson wants S & H to be: 1) enjoined from offering financial assistance to a customer as a means of inducing the customer to distribute Green Stamps; 2) enjoined from making further loans tied to the use of Green Stamps; 3) enjoined from enforcement of tie-in provisions and required to notify customers that such provisions are void; 4) enjoined from lending money to customers on terms more favorable than generally available from customary lending institutions; and 5) required to notify all trading stamp customers of such Order.

Carlson's brief outlines the "key" account concept:

"By obtaining the business of the 'key' account, S & H is also able to obtain the business of nearby 'associate' accounts, because once a customer becomes accustomed to saving a brand of trading stamps issued by a key account, she tends to make repeated shopping trips to that store and will patronize other establishments which issue the same stamps." Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, at 9.

When a regular account is signed the price for a book of 5,000 stamps is $2.50 per thousand to $3.00 per thousand, depending on the volume of business, and preferential terms are provided for the larger customers. "Key" accounts receive even more preferential rates—slightly over $2.00 per thousand—to induce them to use S & H stamps and to induce their use at all locations since the more stamps purchased, the lower the price. Plaintiffs' Memorandum at 11–13.

Payment for the stamps results in "float"—the money that is left in the stamp companies' hands until such time as the stamps are redeemed. The "float" is used for redemptions and for

the cash reserves necessary to lend money to customers. *Id.* at 13–14.

Carlson describes the S & H loan program at some length. Each loan made by S & H utilizes a note, a letter agreement tying the loan to the stamp contract, and the stamp contract. The note is usually a standard promissory note and bears language that it is issued pursuant to the letter agreement. The letter agreement contains three features that Carlson finds significant: (1) The "sole purpose" clause which states the sole purpose of borrowing the amount indicated is to increase the distribution of S & H Green Stamps; (2) The incorporation by reference clause which makes reference to the promissory note and the stamp agreement; (3) And the tie-in which according to Carlson threatens the borrower with immediate acceleration unless it complies with every provision of the stamp agreement, continues to issue S & H stamps at all of its stores, and renews or extends its stamp contract. In addition, if S & H accelerates a loan, the customer faces as well acceleration of all other indebtedness. The stamp agreement stipulates that use of S & H stamps will take place as long as there is a balance outstanding on the loan. *Id.* at 14–19.

Carlson maintains that S & H offers loans that are not available through normal channels because S & H can lend larger amounts for lower terms for a longer time with more flexible repayment provisions. *Id.* at 20–24.

Carlson also alleges that S & H has been aware for some time that its loan arrangement is illegal. After the *Fortner* decision, S & H allegedly had misgivings about its loan program but the decision was made to retain S & H's loan provisions and policies. *Id.* at 24–27. Carlson alleges that the tie-in and acceleration clauses are in the S & H loan agreements to this day. *Id.* at 24–29. S & H's Memorandum of Law at 12–13 indicates, however, that in March 1972 "S & H initiated a change in two aspects of its lending policy. Today S & H will extend credit to its qualified customers without reference to the length of the stamp contract. Also, the 'acceleration' clause has been removed from the loan papers." It would appear, however, that the change of policy was not implemented until near the end of 1972.

A substantial portion of Carlson's brief is devoted to the impact of the S & H customer loan program. *See id.* at 29–42. Carlson points out that since 1962 the number of S & H customer loans has nearly doubled, the amount owed thereunder has nearly tripled, and the average size of the loans has shown a marked increase. Since 1967 the original amount of outstanding loans more than doubled for S & H while at the same time there was a contraction in the over-all stamp market and a number of former competitors of S & H went out of business. Carlson alleges that while it is S & H's policy to limit loans to the amount of the borrower's annual trading stamp purchases, in fact such loans tie up a great deal more business than that because under S & H's agreements with loan customers, the customers must use Green Stamps until any amount borrowed is paid off. Thus if the amount borrowed was $50,000 but the business purchases 5 million dollars worth of stamps, that whole amount of stamp purchases is foreclosed for S & H's competitors. Carlson alleges that at least 200 million dollars worth of business has been foreclosed to S & H's competitors. *Id.* at 29–34. Carlson alleges that "predatory use of the S & H loan program" has directly caused the loss of a Carlson Companies' account and Carlson supports its allegations with references to statements in the Reynolds and Johnson depositions (see discussion below) and exhibits of letters and documents indicating the switch from Gold Bond to S & H stamps. *Id.* at 34–37. Carlson asserts that S & H's loan practices are causing Carlson drastic and immediate harm. Plaintiffs point to statistics for 1967–1972 indicating that while S & H trading stamp revenues have remained relatively constant, Carlson's revenues have dropped from 67.8 million dollars

to 35 million dollars. During the same period, S & H's customer loans in their initial amounts have increased from 22.4 million dollars to 38.4 million dollars. Since 1969, when there were ten significant independent brands of trading stamps, nine have dropped away, leaving only Carlson to offer any "substantial competition" to S & H stamps in the national market. *Id.* at 37–42.

Defendant S & H provides the Court with an entirely different picture of the events that have transpired in the trading stamp industry regarding Carlson's competitive position with S & H. The essence of S & H's position is that Carlson's own shoddy management practices have contributed to its alleged demise and that S & H's stamp program has succeeded independently of its loan program. S & H has provided the Court with a number of documents indicating various Carlson subsidiary stamp customers' disappointment with the stamp program of plaintiffs; an array of affidavits of S & H stamp customers lauding the S & H program and denying that their use of Green Stamps is forced on them through tied loan arrangements; and excerpts from the deposition of H. Glendon Johnson which S & H sets side by side with the customer affidavits supplied to show that Johnson's hearsay testimony is rebutted by the affidavits. The affidavits indicate that S & H's loans are no more favorable than those available elsewhere in the lending market. Defendant's Memorandum of Law at 34–45.

S & H outlines its efforts in recent years to make its product the most attractive among the possible alternatives and the success of its efforts in view of the recent decline in stamp usage among retailers. S & H refers to the changes, mentioned above, that have been implemented to remove the tying clause regarding the length of the stamp contract and the "acceleration" clause from the loan agreements. *See Id.* at 3, et seq. Under the revised policy, S & H alleges that they first carefully scrutinize the potential borrower and then will only consider a short term (13 mos.) loan. After the customer has had an opportunity to acquire a perspective as to the effectiveness of Green Stamps, S & H will thereafter consider loans of greater duration. S & H personnel have allegedly been instructed not to attempt to secure new business by "luring them in with loans." *Id.* at 14. Pages 15–34 of defendant's Memorandum outline how Carlson's problems developed after its stamps were dropped by three "key" accounts which constituted the core of its stamp business. Coupled with the cancellation, Carlson allegedly pulled 100 persons from its 150 persons sales force, leaving an extremely thin force left to service the remaining accounts and find replacements. In addition, S & H outlines the undesirable conditions found at Gold Bond redemption centers, a situation which allegedly has plagued Carlson for some time. During the period after the three "key" accounts cancelled, S & H points out, from the limited information it has been able to discover in this area, Carlson has actively engaged in a loan program as incentive for potential stamp customers to buy Carlson's product.

In certain circumstances summary judgment in antitrust cases has been approved by the Eighth Circuit Court of Appeals. In Kugler v. AAMCO Automatic Transmissions, Inc., 460 F.2d 1214 (8th Cir. 1972), the Court upheld this Court's grant of summary judgment in a tie-in case wherein this Court held that a single package, rather than two separate products, was involved in the business relationship between the parties. The Eighth Circuit has recently reiterated the proper standards to be used to decide a motion for summary judgment:

"Rule 56 of the Federal Rules of Civil Procedure provides for the entry of summary judgment where the record discloses that there exists no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law. Summary judgment is an extreme remedy, one which

is not to be entered unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances. Rotermund v. United States Steel Corporation, 474 F.2d 1139, 1143–1144 (CA8 1973); Luick v. Graybar Electric Company, Inc., 473 F.2d 1360, 1362–1363 (CA8 1973); Cervantes v. Time, 464 F.2d 986, 993 (CA8 1972) and Traylor v. Black, Sivalls & Bryson, Inc., 189 F.2d 213 (CA8 1951)." Ozark Milling Company, Inc. v. Allied Mills, Inc., 480 F.2d 1014 (8th Cir. 1973).

S & H asserts that whether its loans constitute tying arrangements is an issue of fact to be decided at trial. S & H distinguishes its loan program from that in *Fortner*. While in *Fortner* the loans involved far exceeded the value of the goods purchased from U.S. Steel, here, for the most part, defendant's loans do not exceed the customer's purchases of stamps for the year. Here the stamps and loans come from one entity and, according to S & H, there is no evidence that S & H's stamp service is not competitive as to price and quality (unlike the prefabricated houses in *Fortner*). Defendant cites other points of distinction.

S & H argues that the ability of the competitors to offer the product as well as the defendant is a pertinent consideration under footnote 2 in the *Fortner* decision and that, therefore, the factual matter of the relative desirability of S & H loans compared to those available from normal lending institutions or Carlson is but one of many factual matters that must be left to trial.

S & H argues that while Carlson has made general statements regarding the loss of specific accounts (statements which S & H claims are controverted by its affidavits), Carlson has not presented proof of damages so as to allow partial summary judgment.

S & H also maintains that the set of inversely proportional statistics produced by Carlson do not establish a causal connection to compel a finding of damage to plaintiffs and that, at best, plaintiffs' evidence has shown that there is an issue of fact to be tried to a finder of fact.

In oral argument, plaintiffs maintained that the only facts material to this motion were not in dispute. Carlson argues that, interpreting *Fortner*, the only relevant factors to consider are the number of tying arrangements and the amount of the stamp market that the S & H loans have foreclosed from competitors. Carlson argues that the situation here is a *Fortner* type tie-in, that the widespread use of such tie-ins creates economic power, and that a not insubstantial amount of commerce is affected by the S & H loan agreements. It is the plaintiffs' position that the factual conflicts raised by S & H's affidavits are not in issue here. This Court cannot agree, for as this decision at 1086–1087 indicates, a necessary element of proof in this action is a showing that but for the tie-in, the buyer would not have taken the tied product. Another aspect of the factual elements involved in the present case about which little argument has been heard is the factor of size in regard to the proof of S & H's economic power.

There is convincing language in *Fortner* that size of a loan operation may be a significant contributing factor to the "uniqueness" element of consideration:

"U.S. Steel's subsidiary Credit Corp., on the other hand, may well have had a substantial competitive advantage in providing this type of financing because of economies resulting from the nationwide character of its operations." 394 U.S. at 505–506, 89 S.Ct. at 1260.

"[B]arriers to entry in the market for the tied product are raised since, in order to sell to certain buyers, a new company not only must be able to manufacture the tied product but also, must have sufficient financial

strength to offer credit comparable to that provided by larger competitors under tying arrangements. If the larger companies have achieved economies of scale in their credit operations, they can of course exploit these economies legitimately by lowering their credit charges to consumers who purchase credit only, but economies in financing should not, any more than economies in other lines of business, be used to exert economic power over other products that the company produces no more efficiently than its competitors.

\*　　\*　　\*　　\*　　\*　　\*

"Although money is a fungible commodity—like wheat or, for that matter, unfinished steel—credit markets, like other markets, are often imperfect, and it is easy to see how a big company with vast sums of money in its treasury could wield very substantial power in a credit market. Where this is true, tie-ins involving credit can cause all the evils that the antitrust laws have always been intended to prevent, crippling other companies that are equally, if not more, efficient in producing their own products." 394 U.S. at 509, 89 S.Ct. at 1261.

Of course, a showing is necessary here as well that a defendant has illegally exploited its economies, i. e., has induced customers to take items they otherwise would have foregone but for the tie-in.

▆ In Worthern Bank & Trust Co. v. National BankAmericard, Inc., 485 F. 2d 119 (8th Cir. 1973), the Eighth Circuit Court of Appeals denounced the use of summary judgment in a case where there was not sufficient basis in the record to determine the effects of an alleged group boycott and other factual matters. In the instant situation, the holding in *Worthen Bank & Trust* is clearly applicable. The unusual elements of the stamp-loan combination make the uniqueness question appear ·in a light clearly different from, and arguably more difficult to deal with than the uniqueness question in *Fortner*. The Court in *Fortner* cited the now well

known admonition that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles." 394 U.S. at 500, 89 S.Ct. at 1257, citing Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). *See also* Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969). While the instant motion pertains only to the alleged tie-in program of S & H, the issues are certainly complex, and given the uniqueness language of *Fortner*, it is necessary that a trial be held to determine whether the program, after considering all the evidence, did amount to an exercise of unique economic power.

Thus the issues of whether the loan program was an actual tie-in, whether Carlson was able to offer similar loans, whether the loans were factors which influenced consumer choice, and whether the size of S & H's float is a determinative element, are all, *inter alia*, factors which must be aired in a full trial. This Court finds itself in a situation similar to that encountered in White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963):

"We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain."

In the *Worthen Bank & Trust* case, the Eighth Circuit emphasized that:

"The term 'group boycott', . . . is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the 'group boycott' and 'per se' labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed. While as a matter of broad classification these types of labels provide businessmen with intelligible and predictable guidelines for the conduct of business activity, see United States v. Topco Associates, Inc., 405 U.S. 596, 609 n. 10, 92 S.Ct.

1126, 31 L.Ed.2d 515 (1972), and while these labels obviate the tremendous burden trial courts must undertake when applying the rule of reason, *id.* at 609, 92 S.Ct. 1126 we emphasize that:

> " 'It should be plain why there is a real danger of the abuse of the per se principle by those predisposed to offer mechanical or dogmatic solutions to legal problems. In every antitrust case there are two routes to finding illegality: critically analyzing the competitive effects and possible justifications of the challenged practice; or subsuming it under one of the per se rules. The latter route is naturally the more tempting; it is easier to classify a practice in a forbidden category than to demonstrate from the ground up, as it were, why it is against public policy and should be forbidden.' " Elman, "Petrified Opinions" and Competitive Realities, 66 Col.L.Rev. 625, 627 (1966) quoted in Albrecht v. Herald Co., 390 U.S. 145, 170 n. 3, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (Stewart, J., dissenting)." 485 F.2d at 125.

This Court submits that, like a "group boycott," a "tie-in" may evidence characteristics in one situation that are entirely absent in another, especially when the tie-in arises in a relatively unexamined area of commerce. As a consequence, this Court holds that summary judgment is inappropriate in this case and Carlson's motion for summary judgment is therefore denied.

 Summary judgment was granted in *Northern Pacific* and *International Salt* and was approved by the Supreme Court. The Court in each case found that the practice engaged in was of a type which has been denounced as so unreasonable as to be *per se* illegal despite any possible business justifications. The course of the "rule of reason" and its evolution into various *per se* rules is succinctly summarized in United States v. Topco Assoc., Inc., 405 U.S. 596, 606–607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972):

> "On its face § 1 of the Sherman Act appears to bar any combination of entrepreneurs so long as it is 'in restraint of trade.' Theoretically, all manufacturers, distributors, merchants, sellers, and buyers could be considered as potential competitors of each other. Were § 1 to be "read in the narrowest possible way, any commercial contract could be deemed to violate it. Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918) (Brandeis, J.). The history underlying the formulation of the antitrust laws led this Court to conclude, however, that Congress did not intend to prohibit all contracts, nor even all contracts that might in some insignificant degree or attenuated sense restrain trade or competition. In lieu of the narrowest possible reading of § 1, the Court adopted a 'rule of reason' analysis for determining whether most business combinations or contracts violate the prohibitions of the Sherman Act. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619 (1911). An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption. Chicago Board of Trade v. United States, supra, 246 U.S. at 238, 38 S.Ct. 242 at 243.

> "While the Court has utilized the 'rule of reason' in evaluating the legality of most restraints alleged to be violative of the Sherman Act, it has also developed the doctrine that certain business relationships are *per se* violations of the Act without regard to a consideration of their reasonableness. In Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), Mr. Justice

Black explained the appropriateness of, and the need for, *per se* rules:

> '[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.'

"It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act."

Thus a violation which is *per se* illegal may not be justified. It is impossible in this instance, however, to hold the business relationship at issue to be *per se* unreasonable since the courts have not had such "considerable experience" with goods-loan tying arrangements, especially involving the stamp-loan combination, that these practices may be classified as *per se* violative of the Sherman Act. Here the "rule of reason" and possible business justifications must be considered at trial.

■ Under the above considerations it would be improper to conclude that even if the *per se* requirements of an illegal tying arrangement were not met, one might still find the practice unacceptable under the generalized "rule of reason" standard. If the *per se* standards are applicable, but the standards are not met to establish a *per se* viola-

tion, the practice is *a fortiori* reasonable since the *per se* rules incorporate the "rule of reason" concepts. If on the other hand *per se* standards *are not applicable* because the type of practice in question cannot be neatly compartmentalized as a pernicious *per se* violation, then the "rule of reason" and possible business justifications may be brought to a focus upon the practice in question. Such is the case here.

The Court in *Fortner* indicates that the "not insufficient amount of commerce" and "sufficient economic power" standards enunciated in *Northern Pacific* "are necessary only to bring into play the doctrine of *per se* illegality" but that if unsuccessful in proving a *per se* violation "[a] plaintiff can still prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated." 394 U.S. at 499–500, 89 S.Ct. at 1257. Such language would seem to support an argument that one may look to the "rule of reason" whenever the *per se* standards are not met. In *Fortner,* however, the *per se* allegations went to the tying arrangement itself—the more general allegations went to an alleged conspiracy for the purpose of restraining competition and acquiring a monopoly. 394 U.S. at 500, 89 S.Ct. 1252. Thus where, as here, the Court is confined in its summary judgment considerations solely to looking at the tying arrangement, the quoted language would be inapplicable and inconsistent with the use of the *per se* standard as set forth in *Topco. See* Dam, "Fortner Enterprises v. United States Steel: 'Neither A Borrower Nor A Lender Be,'" 1969 Supreme Court Rev. 1, 32–36 (1969).

### III. *The Motion for Preliminary Injunction.*

In its Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment or Preliminary Injunction, Carlson assets that even if the summary judgment motion is denied plaintiffs, a

preliminary injunction should be granted to prevent a threatened wrong or further perpetration of injury. Plaintiffs' Memorandum at 60. Plaintiffs maintain that they have shown that S & H's actions are in furtherance of violations of the Sherman Act; that there is a likelihood that plaintiffs will succeed on the merits; and that immediate and irreparable harm will result if the injunction *pendente lite* is denied. Carlson alleges that damages at the close of litigation, assuming plaintiffs prevail on the merits, will not compensate them for their loss if S & H is allowed to continue its present practices.

S & H responds to Carlson's bid for a preliminary injunction with the assertion that plaintiffs are not entitled to such relief on three grounds:

1. Carlson has not sustained its burden of proof on the issue of immediate and irreparable injury;

2. The presence of disputed issues of fact and complex issues of law makes equitable relief inappropriate; and

3. The injunction sought by Carlson would disrupt, rather than preserve, the status quo *pendente lite*. Defendant's Memorandum of Law at 95–96. In support of the above three allegations S & H maintains that Carlson has done little more than present raw data and assertions in the H. Glendon Johnson deposition *without any showing of causal connection* between the data and assertions and S & H's loan activities. S & H adds that the danger of loss is neither immediate nor direct, and that even if Carlson were ultimately to prevail on the merits, legal remedies are adequate.

Section 16 of the Clayton Act [15 U. S.C. § 26] provides in part that:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . when and under the same conditions

and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity. . . . "

In Benson Hotel Corp. v. Woods, 168 F. 2d 694, 696 (8th Cir. 1948), the Eighth Circuit Court of Appeals indicated that the purpose of an injunction pendente lite is not to determine any controverted right but rather to prevent threatened wrong or further perpetration of an injury, or the doing of any act whereby rights might be threatened. In addition, the Court reasserted the well established position that an application for a temporary injunction is addressed to the discretion of the trial court and the holding will ordinarily not be disturbed on appeal. *See also* E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108 (8th Cir. 1969); Van Hoven Co., Inc. v. Stans, 319 F.Supp. 180 (D.Minn.1970).

It is clear that the burden of proof is on plaintiffs to show that they are entitled to the preliminary injunction they seek. Goodyear Tire & Rubber Co. v. H. Rosenthal Co., 246 F.Supp. 724, 726 (D.Minn.1965). There are four factors which a court should take into account and balance before granting relief: 1) The probability that plaintiff will succeed on the merits; 2) immediate and irreparable harm to plaintiff if the injunction is denied; 3) possible harm to defendant that may result if the injunction is granted; and 4) the public interest in the granting of the preliminary injunction. *See* Van Hoven Co., Inc. v. Stans, 319 F.Supp. 180, 183 (D. Minn.1970), and cases cited therein.[2]

Courts are cautious in their grant of preliminary relief. See *e. g.,* B & W Gas, Inc. v. General Gas Corp., 247 F. Supp. 339 (N.D.Ga.1965). In attempting, however, to balance the delicate considerations involved in the case at hand, it is also helpful to look to the standard provided by Judge Frank in Hamilton

2. *See also* MacIntyre, "Antitrust Injunctions: A Flexible Private Remedy," 1966 Duke L.J. 22, 24 (1966), and Interphoto Corp. v. Min- olta Corp., 295 F.Supp. 711, 717 (S.D.N.Y. 1969).

*Watch Co. v. Benrus Watch Co., Inc.,* 206 F.2d 738, 740 (2d Cir. 1953):

> "To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

*See also* Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 414 F.2d 506, 511 (3rd Cir. 1969).

 As in the motion for summary judgment, the questions here are confined to the issuance of temporary relief concerning only the alleged tie-in between Green Stamps and loans. As discussed previously, the instant litigation presents to the Court complex and novel issues of law and fact. Defendant contests, *inter alia,* the fact of a tie-in, the element of compulsion in the relationship between buyers and S & H, and plaintiffs' non-ability to compete with S & H. In addition, the presence of "float" as capital for financing and the possibility of size and financial economies of scale being a determinant in the "uniqueness" question present potentially novel considerations to the Court in the trial of this case. It has been held that where there are complex or novel issues of law and fact, the resolution of which is in doubt, a preliminary injunction should be denied. N. W. Controls, Inc. v. Outboard Marine Corp., 317 F.Supp. 698, 702 (D.Del.1970); Dalmo Sales Co. v. Tysons Corner Regional Shopping Center, 308 F.Supp. 988, 994 (D.D.C.1970); Instant Delivery Corp. v. City Stores Co. (Lit. Bros. Div.), 284 F.Supp. 941, 946–947 (E.D.Pa.1968).[3] In view of the above criteria this Court is unable to grant Carlson the relief requested. It is important for the parties to note, however, that the Court's decision is based upon its understanding that S & H has discontinued its practice of tying stamp contracts to loan agreements, and accelerating loans if the use of Green Stamps has been discontinued. None of the factors discussed herein operate independently of the others and the Court's understanding regarding the discontinuance of the tie-ins cannot be separated from its consideration of the separate factors.

It would appear to be the correct view that an illegal tie-in could be found only if S & H customers were forced to accept a product they did not want. Evidence leading toward that conclusion is neither undisputed nor clearly established by plaintiffs. Plaintiffs' testimony regarding success on the merits goes rather to the S & H documents concerning the principal components of the tie-in arrangement, the internal discussions of S & H management concerning their views of the legality of the tie-ins, and the enormous scope of potential customers foreclosed through the arrangements for loans between S & H customers. In a situation, however, where there is a great potential for irreparable damage, the likelihood of success on the merits need not be as conclusive as may be necessary under other circumstances. "The likelihood of success is 'merely one strong factor to be weighed along with the comparative injuries of the parties.'" Dino De Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir.1966), quoting from Unicon Management Corp. v. Koppers Co., Inc., 366 F.2d 199, 205 (2d Cir., 1966), in turn quoting from 3 Barron &

---

3. *See also* Graham v. Triangle Publications, Inc., 233 F.Supp. 825, 829 (E.D.Pa.1964). *But see* Muskegon Piston Ring Co. v. Gulf & Western Industries, Inc., 328 F.2d 830, 831 (6th Cir. 1964), in which the Court states: "We cannot determine at this juncture of the case whether or not Muskegon is entitled to the ultimate relief which it seeks."

Holtzoff, Federal Practice and Procedure, § 1433 at 493 (1958).[4]

According to the testimony of Peter Max in Nov. 5, Transcript at 141–144 as corrected at 168–170, S & H had, as of July 1, 1972, 26 million dollars in loans outstanding, the original amount of which was nearly 38 million. Because the loan contract tied the borrowers for a term of five years, the amount of stamp business foreclosed was 190 million dollars and this amount is effectively foreclosed from competition during the course of the tie-in. In addition, foreclosure from "key accounts" in an area prevents access as well to those associate accounts which tend to follow the lead of the "key accounts." Mr. Max also testified that from December 31, 1960, to June of 1972 the amount of S & H loans outstanding had risen from $11,169,000 to $26,350,000, the number of loans had risen, and the average size of S & H loans granted had just about doubled. Mr. Max's conclusion based upon the amount of commerce foreclosed is that "there has been a substantial adverse effect on competition and on competitors in the stamp business." Nov. 5, Transcript at 144. Facts in the deposition of H. Glendon Johnson as related in Carlson's memorandum indicates the steady decline of Carlson's trading stamp revenues from 1967 to 1972, a period in which S & H's revenues had remained constant.

■ This Court is able to draw no conclusions from the testimony or arguments presented. It appears from Mr. Max's testimony that an enormous amount of commerce has been tied up by S & H's past loan practices. However, Mr. Max's testimony does not provide a sufficient causal link between the figures indicating S & H's relative prosperity and Carlson's continual decline. While ultimately the facts may bear out the correlation, the threat to Carlson of further disastrous decline due to S & H's activities during the remainder of this litigation has not been sufficiently demonstrated to this Court. While there is only the need to show the threat of immediate harm, that factor must be weighed in connection with the evidence of a causal connection between the activities of the defendant and the threat to plaintiffs.[5] Were the tying provisions still being instituted, this Court might have weighed the factors differently.

Injunctive relief is denied Carlson regarding the continuation of the tie-in and acceleration provisions of the stamp-loan contracts because of difficulties of proof of ultimate success on the merits, and proof of connection between S & H's practices and Carlson's decline, and the discontinuance of the contested practice by the defendant. Injunctive relief must be denied as well regarding those loans entered prior to the institution of this action. Plaintiffs have submitted testimony and argued that these allegedly illegally tied loans are now foreclosing plaintiffs and other competitors of S & H from the business that may be available were the customers of S & H not tied to Green Stamps for the duration of their loans. Plaintiffs argue that by allowing S & H to retain the tying arrangements regarding those transactions, Carlson is suffering irreparable damage since not having access to the foreclosed accounts may mean as well the loss of other accounts in the same area. To grant such relief, how-

---

4. *See also* Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1056 (1965): "Clear evidence of irreparable injury should result in a less stringent requirement of certainty of victory; greater certainty of victory should result in a less stringent requirement of proof of irreparable injury."

5. *See* Automatic Radio Mfg. Co., Inc. v. Ford Motor Co., 272 F.Supp. 744, 748 (D.Mass. 1967), aff'd 390 F.2d 113 (1st Cir. 1968), cert. denied 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968), in which plaintiff was denied preliminary injunctive relief in part because the plaintiffs had failed to show the connection between their declining sales and the allegedly illegal tie-in in that case. *See also* B & W Gas, Inc. v. General Gas Corp., 247 F.Supp. 339, 343 (N.D.Ga.1965).

ever, would be to go beyond the scope of the injunction pendente lite. Rather than maintaining the status quo, such an injunction would be, in effect, an adjudication on the merits of the case in advance of trial. Should plaintiffs ultimately prevail, an injunction dissolving remaining tie-ins might well be in order. In addition, any injury suffered from the foreclosure from those markets during the litigation may be compensable in damages. This Court is not unmindful of the irreparable nature of the loss of consumer acceptance and good will that may accompany Carlson's inability to enter the market of those customers of S & H now allegedly tied to Green Stamps. On the other hand, the factors discussed above with regard to enjoining the continuance of the tie-in and acceleration clauses, coupled with the function of the preliminary injunction to preserve the status quo, militate against the grant of an injunction to dissolve the tie-ins at this stage of the litigation.

Carlson has requested an injunction pendente lite regarding the issuance of any low cost loans by the defendant. Peter Max has testified that even if no explicit tying provisions are present in a low cost loan arrangement with a stamp customer, availability of low cost loans creates an implicit tie which bars competitors access to that customer. *See* Nov. 6, Transcript at 156–57. The issues raised in this connection present a question that has, as far as this Court can determine, not been raised prior to this litigation. This Court can do no more at this juncture than guess at the outcome of an implicit tie-in argument. This issue, even more than those discussed in regard to the explicit tie-ins, requires the fullness of a complete evidentiary hearing at trial before any conclusions can be drawn.

On the basis of the foregoing discussion, therefore, Carlson's request for a preliminary injunction is denied subject to rehearing should S & H reinstitute the tying or acceleration provisions in its loan contracts.

## SUPPLEMENTAL OPINION

The parties in the above captioned antitrust case appeared before this Court for a hearing on plaintiffs' motion to compel production of documents. Pursuant to Rule 37 plaintiffs have moved to have the Court order the production of all documents requested by plaintiffs' initial and supplemental document requests. Defendant has objected to the production of any documents dated after June 16, 1972, or which contain information relating to post-complaint activities of defendant. Plaintiffs have moved in addition to have the Court order the production of documents specified in requests 1–12, 14–23, and 25–30 of Plaintiffs' Second Supplemental Document Request, dated August 16, 1973.

### A. *Post-Complaint Discovery.*

■ It is undeniable that the Federal Rules of Civil Procedure governing discovery should serve to clarify and confine the issues to be litigated and to reveal to the parties and the Court the existence or whereabouts of facts relative to those issues. *See* Hickman v. Taylor, 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947); United States v. Procter & Gamble Co., 356 U.S. 677, 682–683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); 4 J. Moore, Federal Practice Par. 26.02[1], at 26–61—26–64 (2d ed. 1972). Rule 26(b)(1) specifies that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action" and that "[i]t is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

Defendant strenuously argues that plaintiffs are not entitled under any circumstances to discovery postdating the complaint. Defendant cites a host of cases to support this position, including Devex Corp. v. General Motors Corp., 275 F.Supp. 310 (D.Del.1967); Singer Mfg. Co. v. Brother Int'l Corp., 191 F. Supp. 322 (S.D.N.Y.1960); Stanzler v.

Loew's Theatre and Realty Corp., 19 F. R.D. 286 (D.R.I.1955); Banana Distrib. Inc. v. United Fruit Co., 19 F.R.D. 244 (S.D.N.Y.1956); O'Brien v. Equitable Life Assurance Soc'y of United States, 14 F.R.D. 141 (W.D.Mo.1953); McCarthy v. Benton, 13 F.R.D. 454 (D.D. C.1952); William A. Meier Glass Co., Inc. v. Anchor Hocking Glass Corp., 11 F.R.D. 487 (W.D.Pa.1951); Cinema Amusements, Inc. v. Loew's, Inc., 7 F.R. D. 318 (D.Del.1947); Massachusetts Bonding & Ins. Co. v. Harrisburg Trust Co., 2 F.R.D. 197 (M.D.Pa.1941); E. I. duPont de Nemours & Co. v. Byrnes, 1 F.R.D. 34 (S.D.N.Y.1939).

The genesis of this line of cases appears to be McInerney v. Wm. P. McDonald Const. Co., 28 F.Supp. 557 (E.D.N.Y.1939), in which the Court sustained an objection to post-complaint discovery on the ground that "the activities or operations of the defendant since the filing of the complaint effect neither the issue of validity nor infringement. The rules of civil procedure cannot be successfully invoked to make relevant material that is not within the issues of the cause." 28 F.Supp. at 558. Defendant quotes at some length from Cinema Amusements, Inc. v. Loew's, Inc., 7 F.R. D. 318 (D.Del.1947), which indicates that "[i]t is generally held that relevancy to the issue requires that the interrogatories be confined to a period ending with the commencement of the suit." 7 F.R.D. at 320. For that proposition the Delaware court cites *McInerney, supra*, and Massachusetts Bonding & Ins. Co. v. Harrisburg Trust Co., 2 F.R.D 197 (M.D.Pa.1941). *Massachusetts Bonding* involved an action by an insurance company to recover premiums due on a bond executed to secure deposits. Plaintiff had alleged that an annual premium was unpaid for the years 1933 through 1937 and that during those years the bond was in effect. The Court held the discovery to be limited by the scope of the pleadings:

"The five interrogatories in question ask certain information covering the period from November 21, 1932, to June 27, 1940, whereas the facts necessary to support the alleged cause of action must have existed not later than February 11, 1938, the date this action was started. Information concerning transactions or events after that date would be irrelevant and immaterial and would not support the allegations of the complaint. A party will not be required to answer interrogatories where the answers necessarily will be irrelevant and immaterial." 2 F.R.D. at 198.

*Cinema Amusements* also cites Ball v. Paramount Pictures, Inc., 4 F.R.D. 194 (W.D.Pa.1944), to hold that the cause of action must be determined as of the time of the institution of suit. Only if the right to recover is eventually established may post-complaint discovery be available, and then only to the extent of damages. 7 F.R.D. at 320–321. *Ball*, however, turned not upon a flat assertion that interrogatories must be confined to pre-complaint matters but rather upon a determination by the Court that the post-complaint facts sought were irrelevant for any purpose except the computation of damages. None of the cases above, with the exception of *Cinema Amusements*, says that post-complaint information would not be discoverable if it were relevant, at least insofar as the issues concerning which the information was sought were raised in the complaint. To the extent that *Cinema Amusements* may prohibit discover of relevant post-complaint information, this Court is of the opinion that that case is in error.

Even if the Court were to accept the cases cited in *Cinema Amusements* as standing for the proposition which the defendant urges upon this Court, the 1946 amendments to Rule 26 and recent commentary and court interpretations indicate the need for a more liberal interpretation of discovery procedures. Bass v. Gulf Oil Corp., 304 F.Supp. 1041 (S.D.Miss.1969), presents an analytic approach to the post-complaint discovery situation. *Bass* involved an action by royalty owners charging that defendants

had combined and conspired in controlling and monopolizing crude oil prices in violation of §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act. After reviewing the early cases discussed above, the Court approved the commentators' criticism of the prohibition of post-complaint discovery as well as criticism of those cases which indicate that such discovery may be obtained only after the filing of a supplemental pleading. The Court in *Bass* adopted a test which looks only to the relevancy of the material sought to be discovered:

> "In this Court's judgment virtually all of the authorities relied on by the defendants seemingly limit the scope of discovery to the issues raised by the pleadings rather than determine whether the information sought is relevant to the subject matter of the suit, which is the correct test, despite the admissibility of the evidence in the trial of the case. This standard is specifically set forth in the Rules, which this Court feels should be liberally construed, to accomplish their true purpose, that is, to arrive at the truth while at the same time not permitting unbridled and wholly irrelevant discovery." 304 F.Supp. at 1046.

*See also* 4 J. Moore, Federal Practice, Par. 26.56[1], at 26–120–22 (2d ed. 1972). The criterion adopted in *Bass* neither confines the scope of discovery to matters happening before the complaint was filed, nor to only that information which would be material evidence at trial, *i.e.*, information confined to issues raised by the pleadings.

This Court is of the opinion that where documents requested are relevant to the subject matter involved in the pending litigation, any documents coming into existence after the filing of the complaint and which are requested in supplemental requests are discoverable. This is especially true here where various counts in the complaint allege continuing violations. Plaintiffs have charged defendant, *inter alia*, with continuing violations in the use of illegal and unfair trade practices (Paragraph 26), lending money or granting economic assistance to retailers or wholesalers as an inducement to switch to Green Stamps (Paragraph 29(b)), offering preferential and discriminatory prices, terms and conditions to users of competing stamps in order to divert purchasers to Green Stamps (Paragraph 29(c)), and use of illegal means to interfere with and destroy plaintiffs' contractual and other business relationships with customers (Paragraph 46). Even if post-complaint discovery were to be limited solely to those issues raised by the pleadings, the above mentioned matters would clearly be within the scope of discovery.

Defendant implies that if post-complaint discovery were relevant here, such discovery would have to be initiated by subsequent pleadings. Initially, in regard to those allegations of plaintiffs' complaint which allege continuing violations, such supplementation would be unnecessary under any circumstances. In addition, a strong argument may be made that supplementation of the pleadings, at least before discovery can be carried out concerning matters relevant to the subject matter involved in the pending litigation, is useless, obstructive, and unnecessary. As pointed out in *Bass, supra*, Professor Moore indicates that "[q]uestions as to acts subsequent to the events giving rise to liability are permissible as are questions regarding acts subsequent to the date of the complaint, as these acts may be covered by a supplemental pleading." 4 J. Moore, Federal Practice, Par. 26.56[1] at 26–129 (2d ed. 1972). Professor Moore later points out regarding the need to file a supplemental complaint before discovery of damages occurring post-complaint that such a rule is unduly narrow and "[i]n effect, the cart is put before the horse." 4 J. Moore, Federal Practice, Par. 26.56[5], at 26–187–88 (2d ed. 1972). The Court in *Bass* makes the following analysis:

> "In other words, Professor Moore takes the position that discovery should precede the filing of a supple-

mental pleading which in many cases cannot be formulated or filed in good faith when the pleader·is without sufficient facts to make a short and plain statement of the claim showing that he is entitled to relief as required by Rule (a)(2). It seems that most cases holding that a supplemental pleading must be filed prior to the utilization of discovery to determine whether or not there is in fact a basis for so filing would be in effect begging the question, that is, if the pleader had information sufficient to file the supplemental pleading, he need not use the discovery procedure for one of the important purposes for which it is designed." 304 F.Supp. at 1046.

One of the cases cited in support of supplemental pleadings concerning post-complaint discovery makes the following observation:

> "The objection as to inquiry into matters subsequent to the commencement of the action is frequently and effectively met by the point that the interrogating party can normally supplement its pleading so as to include that period and it is pure formalism in such cases therefore to bar such an inquiry." Caldwell-Clements, Inc. v. McGraw-Hill Pub. Co., Inc., 12 F.R.D. 531, 535 (S.D.N.Y.1952).

Furthermore, unless the litigant seeks to later use the information discovered as material at trial, information which is relevant to the subject matter of the pending litigation but not specifically within the scope of the issues pleaded may be discovered and the pleadings need not be amended at any time. It would appear that relevance for the purposes of discovery has been confused with admissibility of evidence to be used later at trial. Rule 26(b)(1) specifically excludes a piece of information's inadmissibility as evidence from being a bar to discovery.

It is this Court's position, therefore, that post-complaint material which is relevant to the subject matter involved in this litigation is discoverable without need for amendment of the pleadings. Supplementary document requests pursuant to Rule 26(e)(3) are all that is needed to bring relevant document discovery up to date. Should material be requested which is not specifically encompassed by issues raised in the pleadings, but which is relevant to the subject matter of the action, such matter is discoverable and may later be included in the pleadings, if later required for admissibility at trial, by amendments thereto. The need for considerable latitude in discovery of this type is noted in *Bass*:

> "The Courts have also been liberal in allowing discovery in antitrust cases because of the public importance of the decision, the need of large corporate defendants to know which of their many activities are attacked, the issue narrowing function of discovery, and the fact that one side may have all the facts and the ability to conceal those facts from its adversary, as noted by the Court in Leonia Amusement Corp. v. Loew's, Inc., 16 F.R.D. 583 (S.D.N.Y.1954) in which the Court observed:
>
> > 'I think it is generally conceded that the rule for discovery in these antitrust cases should be liberally construed to permit a discovery.
> >
> > 'In such cases the facts of the conspiracy are largely in the possession and within the knowledge of the defendants. This 'is so because of the very nature of the claimed conspiracy.
> >
> > 'The acts which constitute it are usually unavailable and unknown to plaintiff. Resort, therefore, must be had to the discovery procedure of the Federal Rules of Civil Procedure and the Courts have almost uniformly been most liberal in the construction and interpretation of the Federal discovery procedure.' " 304 F.Supp. at 1046–1047.

This Court finally notes a recent decision supporting the determination of this Court. Cleo Wrap Corp. v. Elsner

**1104**

Engineering Works, Inc., 59 F.R.D. 386, 388 (M.D.Pa.1972), summarizes post-complaint discovery:

> "The fact that plaintiff is seeking discovery of facts which occurred after suit was filed is not determinative. Under modern discovery procedure an interrogatory must be answered if there is a possibility that the information sought may be relevant to the subject matter of the action. Bass v. Gulf Oil Corp., 304 F.Supp. 1041 (S. D.Miss. 1969); Wright & Miller, Federal Practice and Procedure (Civil) § 2008, pp. 46, 47."

**B.** *Documents Requested from the Reynolds Deposition.*

The remainder of plaintiffs' motion refers to documents identified during the taking of the deposition of Richard Reynolds and requested in plaintiffs' Second Supplemental Document Request dated August 16, 1973. At the time of the hearing of this motion the Court suggested that counsel meet to determine those areas upon which they could agree regarding production of the requested documents, especially in view of defendant's protestations that much of the discovery requested is duplicative. Subsequent to the filing of the instant motion several letters were exchanged between the parties indicating that discovery at defendant's zone and district offices could begin after the Court had determined the scope of discovery to take place regarding post-complaint documentation. The Court is presently of the opinion that before any ruling is made regarding the Reynolds' documents, discovery should proceed at the remaining zone and district offices in accord with this opinion. Such discovery may provide various of the documents requested in the Second Supplemental Document Request. Following such discovery, if the parties have not narrowed the areas of contention regarding these documents, the parties should meet to determine where they yet disagree. Plaintiffs should then be in a position to know what material they may already possess. Before the commencement of zone and district office document production, attorneys for each party may wish to consider counsel's suggestion that once the documents in those offices are identified and found not to be overly cumbersome to transport, they may be transported to one or more of defendant's regional offices for the convenience and expedience of both parties.

It is so ordered.